George E. FREZZELL, Appellant,

v.

UNITED STATES, Appellee.

Robert PRICE, Jr., Appellant,

v.

UNITED STATES, Appellee.

Nos. 10249 and 10322.

District of Columbia Court of Appeals.

Argued Sept. 12, 1977.

Decided Dec. 14, 1977.

Sanford Z. Berman, Hyattsville, Md., for appellant Frezzell.

John H. Gullett, Washington, D. C., for appellant Price.

Steven D. Gordon, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry and Martin J. Linski, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, and MACK and FERREN, Associate Judges.

MACK, Associate Judge:

This is an appeal from appellant Frezzell's conviction of first-degree murder while armed (D.C.Code 1973 §§ 22–2401, –3202 and possession of a prohibited weapon (*id.* § 22–3214(b)), and appellant Price's conviction of first-degree murder (*id.* § 22–2401) and possession of a prohibited weapon. The appellants allege, *inter alia*, that the government's failure to turn over potentially exculpatory material prior to trial deprived them of due process under the rule of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The facts giving rise to this argument are complex, and will be set out in full.

The government's evidence established that on Sunday, January 12, 1975, the decedent, Phillip Washington, and both appellants were at a party with several other people at an apartment at 836 Barnaby Street, S.E., where appellant Price resided. During the course of the party, appellant Frezzell and Mr. Washington became involved in an altercation and Washington was asked to leave. According to the essentially similar testimony of two of the other people at the party, appellant Price then went to the bedroom closet, took out a shotgun, and said to Frezzell " 'You going

to kill him or what.' " Frezzell took the shotgun, left the apartment, and returned approximately ten minutes later saying " 'I just killed [him] and I'll kill anybody in here.' " Price took the shotgun from Frezzell and put it back in the closet.

Phillip Washington's body was found at the rear of 832 Barnaby Street, S.E. His death was caused by multiple injuries from a shotgun wound to the left shoulder and chest. There were no apparent signs of a robbery since his pockets appeared undisturbed and his wallet was still in one pocket. No weapon or fingerprints were found at the scene, but an expended red shotgun shell was found approximately 15 to 20 feet from the body. An expert in firearms examination and toolmark identification stated that as a result of the comparisons he had made, it was his opinion that the expended shotgun shell found at the scene of the murder had been fired by Price's shotgun. He further stated that while it was impossible to make a definite identification with respect to the shotgun shell pellets and the wadding which were recovered from Washington's body, those pellets and wadding were compatible in all respects with the expended shell found at the scene.

At the time of the murder Mr. Price was staying at 836 Barnaby St. S.E., at the apartment of a Ms. Barnes, who was visiting friends in Maryland. Ms. Barnes testified that Mr. Price had a key to her apartment, and that one or two weeks before the party he had brought a shotgun into the apartment and stored it on the top shelf of the bedroom closet. She also saw two long red shells which were kept at the top of the closet in a small file box. The last time Ms. Barnes saw the shotgun in the closet prior to January 12 was on Friday, January 10. When she returned to her apartment on Monday, January 13, she noticed that the shotgun was no longer in the bedroom closet. She found it in the living room closet wrapped in newspaper, and later in the week noticed that it was no longer in the apartment at all. She did not see the red shotgun shells again after January 12. Several days after the party, the shotgun

was cut up and hidden by one of the people who had been present. This person later led the police to the gun, and identified the reassembled shotgun in court. Ms. Barnes was also shown the reassembled shotgun in court, and said that it looked like the one Price had kept in her apartment. Further, she was shown the expended red shotgun shell recovered from the murder scene, and stated that it looked like the shells she had seen in her apartment.

In addition to the testimony of Ms. Barnes and the two men at the party, there was also testimony by a neighbor, residing at 828 Barnaby Street, S.E., that he was standing in front of his apartment building on the evening of January 12, 1975, and saw a man come out of 836 Barnaby Street with what he thought was a rifle and walk around to the rear of that building. During the period the man was out of sight the neighbor heard a single shot, and then saw the man run back around the building and reenter 836 Barnaby Street still carrying the gun. The light was dim and the neighbor could only see the man as he came out of the building at 836; thus he could not identify him, but did state that he was a tall, slim black male of about twenty years of age.

Detective Robert Flackley responded to a radio run of the shooting and arrived at the scene to find two people standing by Mr. Washington's body. They identified themselves as Gerald Brown and James Smith. Smith gave Flackley an oral statement including a description of the assailant he observed leaving the scene. Smith described the man as five feet seven to five feet nine, and sixteen to nineteen years of age.[1] Detective Flackley wrote this information on the blank marked "description" on the official police report, which was given to the defense during trial one day prior to his testimony. While Detective Flackley was

present at the scene of the murder a radio lookout based on the description given by Smith was flashed by an Officer Clark, who did not testify. Detective Paul McConnell also arrived on the scene and took down the James Smith description as part of his official report, which was turned over to the defense prior to his cross-examination. On such cross-examination Detective McConnell stated that he would have taken notes on any interviews conducted on the scene but that he had been unable to locate a notebook covering any notations on January 12, 1975.

At the murder scene James Smith had attempted to leave, and had to be physically restrained and taken downtown to give the formal statement which was made available to the defense. Smith had no corroborative identification on him and could not be located prior to trial, as the home and business addresses he gave proved untraceable.

The trial court refused to allow into evidence the description given by James Smith in the police reports or the substance of the flash lookout on the ground that they were hearsay. The court refused to let either Detective Flackley or McConnell testify as to the substance of any conversations with Smith on the ground that they were also hearsay. The court would not impose sanctions under the Jencks Act[2] or the *Brady* rule for the failure to produce Detective McConnell's notes and denied a motion to dismiss pursuant to *Brady*, ruling that there had been no suppression of Smith's statement by the government, since it was in fact given to the defense, and that *Brady* was therefore inapplicable. The appellants now contend that they were deprived of due process under *Brady* by the failure of the prosecution to produce Smith's statement until midtrial. We disagree with the contention, and affirm the convictions.

---

1. Appellant Frezzell is six feet tall and forty years old.

2. Appellants claim that the loss of Detective McConnell's notes warranted the imposition of Jencks Act Sanctions. Even if we assume that Jencks statements were lost, this was of no consequence to appellants. Detective McCon-

nell could not testify with respect to them because of the hearsay problem, and the statement attributed to Smith himself would have been that of a witness who did not testify—a circumstance not invoking the application of the Jencks Act. *See* 18 U.S.C. § 3500 (1970).

The Supreme Court in *Brady* held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good or bad faith of the prosecution. *Id.* at 87, 83 S.Ct. 1194. In *Brady*, however, there was a specific request for the material. The prosecutor was made aware of exactly what the defense desired, yet withheld that information until after conviction. Where the defense either makes no request at all, or asks only generally for "all *Brady* material," the prosecutor is not put on notice of what is sought. In clarifying *Brady* the Supreme Court concluded that "there is no significant difference between cases in which there has been merely a general request for exculpatory matter and cases . . . in which there has been no request at all." *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976). Thus every nondisclosure cannot be treated consistently as error. *Smith v. United States*, D.C.App., 363 A.2d 667, 668 (1976).

Moreover, a prosecutor does not violate the constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial. *United States v. Agurs, supra*, 427 U.S. at 108, 96 S.Ct. 2392. The proper standard of materiality is whether the omitted evidence creates a reasonable doubt that did not otherwise exist, and the omission must be evaluated in the context of the entire record. *Id.* at 112, 96 S.Ct. 2392. While the trial court did not consider the issue of materiality in the instant case, we comment upon the record. Here, where there is the eyewitness testimony of two people present at the party as to the altercation between Frezzell and Washington, and Price's giving Frezzell a shotgun, expert and other testimony linking Price's shotgun to the shooting, and the testimony of the neighbor connecting the person carrying the shotgun with 836 Barnaby Street, it cannot be said that any exculpatory description of a witness who gave a name and address that could not be traced would have created a reasonable doubt as to guilt.

It would have been better practice for the defense to have been apprised earlier of the fact that there was a witness with potentially exculpatory evidence so that counsel could have attempted to locate Mr. Smith. If he had been present at trial the information regarding his description would not have been hearsay and would thus have been admissible. However, once the report of Mr. Smith's description was turned over to the defense, it was then incumbent upon counsel to request a continuance in order to make use of the information. No such request was made. *Smith v. United States, supra.*

In view of the special circumstances of this case, including the overwhelming testimonial evidence, the fact that only a general *Brady* request was made, and that the material was turned over to the defense but a continuance was not requested to seek use of the material, we cannot find that the appellant was prejudiced by the preliminary nondisclosure. Furthermore, we have carefully examined the other assignments of error and find them to be without merit.

*Affirmed.*