**Allen N. McCOWAN, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 81–1547.**

District of Columbia Court of Appeals.

Argued Dec. 14, 1982.

Decided April 12, 1983.

---

Timothy D. Junkin, Washington, D.C., appointed by the court, for appellant.

E. Anne McKinsey, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Michael W. Farrell, John R. Fisher and William J. Bowman, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before FERREN and BELSON, Associate Judges, and KELLY,* Associate Judge, Retired.

KELLY, Associate Judge, Retired:

Appellant was convicted by a jury of first-degree felony murder while armed,

* Judge Kelly was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on March 31, 1983.

D.C.Code §§ 22–2401, –3202 (1973) [recodified respectively as D.C.Code §§ 22–2401, –3202 (1981)], and attempted robbery while armed, D.C.Code §§ 22–2902, –3202 (1973) [recodified respectively as D.C.Code §§ 22–2902, –3202 (1981)]. On appeal, he asserts as reversible error (1) the trial court's refusal to permit individual *voir dire* of those prospective jurors with strong religious views, (2) the admission of other crimes evidence, and (3) the government's improper rebuttal argument. We affirm.

## I

On July 8, 1980, Unit Crossley was killed by a single shotgun blast to his chest during an attempted armed robbery. Dallas Crossley, his wife, was the sole eyewitness to the shooting.

At trial, Mrs. Crossley testified[1] that her husband's assailant wore a heavy, red and gold plaid jacket and a brown felt hat. She described him as a light-complected black man, 25–30 years old, about 5'11" tall, weighing approximately 160 pounds. Another government witness, Anthony Burton, testified that, on the day in question from inside his house, he saw a light-complected black man, about 5'11" tall, walk briskly by and break into a run. The man appeared to carry something beneath the jacket he wore.[2]

Two additional government witnesses, siblings Charles Rowe and Sherrill Roache, testified that appellant confessed to his involvement in the shooting. Shortly after noon on the day of the incident, appellant appeared at their apartment wearing a shirt, slacks and a brown derby hat and carrying a heavy plaid jacket and a sawed-off shotgun. He was sweating, breathing hard and had blood on his face. Appellant described to them the attempted robbery. He claimed that the gun discharged as the man tried to grab it.

Rowe refused appellant permission to hide the shotgun at the apartment. Roache initially disbelieved appellant's story. The following day, however, she read a newspaper article reporting a shooting which factually paralleled appellant's confession. Upon being confronted with the article, appellant acknowledged that he was the assailant and asked Roache for her copy of the article.

Neither Rowe nor Roache reported appellant's confession to the police until seven months later in February 1981. At that time, they were assisting police in the investigation of the independent burglary of their apartment. A young neighbor had identified appellant as the burglar. When asked by a police officer whether they knew of any previous criminal activity of appellant, they informed the officer of appellant's confession to the July 8, 1980 shooting.

Appellant testified at trial. He denied confessing to the commission of the holdup/shooting and claimed that he first learned of the incident when he was arrested in early 1981. He also denied owning a heavy plaid or checkered jacket similar to that which Mrs. Crossley and Andrew Burton testified the assailant wore and which Rowe and Roache stated appellant brought to their apartment on July 8.

Appellant was unable to state where he was on July 8, 1980. To establish his whereabouts, he inquired of a temporary

---

1. Mrs. Crossley was terminally ill at the time of the offense. Her testimony was received at trial through a video taped deposition in which the prosecutor and appellant's counsel participated. Mrs. Crossley died approximately seven weeks before the trial began.

2. Before her deposition, Mrs. Crossley positively identified appellant from a photo array and later from a lineup. She subsequently reaffirmed her identification of appellant when shown a photograph of the lineup. Anthony Burton also identified appellant, both before trial from a photograph of the lineup and at trial, as the person he had seen pass by his house shortly after the shotgun blast.

employer whether he worked on the day in question; according to the employer, he did not. Although appellant testified that he was in frequent contact with his family, he never discussed with them his whereabouts on July 8.

The jury heard closing arguments from both sides. It convicted appellant on both counts.

## II

Appellant initially assigns as error the trial court's refusal to permit individual *voir dire* of prospective jurors with strong religious views.[3]

█ A defendant may examine prospective jurors in order to expose any prejudice which would tend to indicate a disqualifying state of mind. *Coleman v. United States,* 379 A.2d 951, 954 (D.C.1977). Indeed,

> the very purpose of the *voir dire* is to permit counsel to satisfy themselves that they have an impartial jury. Nothing could be plainer than that a predisposition to attach greater or lesser credence to any witness' testimony is inconsistent with this fundament of our legal system, and ... the defendant is entitled to explore this area of possible disqualification prior to the impanelling of the jury.

*Harvin v. United States,* 297 A.2d 774, 777–78 (D.C.1972) (footnote omitted) (police officer testimony). *Voir dire* inquiry into a juror's religious beliefs is proper "where it is a necessary predicate to the exercise of peremptory challenges." *Coleman, supra,* 379 A.2d at 954.

█ Nevertheless, the "method and manner of conducting a *voir dire* are left to the discretion of the trial judge," *United States v. Bryant,* 153 U.S.App.D.C. 72, 76, 471 F.2d 1040, 1044 (1972) (per curiam), *cert. denied,* 409 U.S. 1112, 93 S.Ct. 923, 34 L.Ed.2d 693 (1973), "subject to the 'essential demands of fairness.'" *Coleman, supra,* 379 A.2d at 954 (quoting *Aldridge v. United States,* 283 U.S. 308, 310, 51 S.Ct. 470, 471, 75 L.Ed. 1054 (1931)). *See* Super.Ct.Crim.R. 24. A ruling of the trial court on the scope and context of *voir dire* will be overturned only where it constitutes an abuse of discretion prejudicing a party's rights. *Coleman, supra,* 379 A.2d at 954 (citing *United States v. Liddy,* 166 U.S.App.D.C. 95, 509 F.2d 428 (1974), *cert. denied,* 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975)).

█ Defense counsel at *voir dire* proposed seven questions relating to the religious beliefs of the jury.[4] Despite the trial judge's view that defense counsel was exaggerating Mrs. Crossley's reliance on her reli-

---

**3.** This issue arises from various statements of Mrs. Crossley during her videotaped deposition. During direct examination regarding her identification of appellant, she stated that, before the lineup, she prayed to the Lord and that she was certain that she had picked the correct man—the Lord was on her side. Nevertheless, upon further inquiry, she asserted that she picked appellant "based on seeing him kill my husband." We note that were it not for Mrs. Crossley's unfortunate terminal illness this issue would not be before us.

**4.** As stated by the court, the questions were:
> (1) Are there any members of this panel who believe that people, persons, those of us here on earth are able to talk or speak directly with God as human beings?
> (2) Are there any members of the panel who believe that God helps persons on earth with certain decisions which have to be made in life?

> (3) Are there any members of the jury panel who believe that persons on earth should look to God for help in making important decisions in life?
> (4) Are there any members of the jury panel who believe that they or close friends or a family member have been actually spoken to by God?
> (5) Are there any members of the jury panel who believe that someone who listens to God when making decisions in life will necessarily make correct or right decisions?
> (6) Are there any members of the panel who believe that as a person nears death their ability to communicate with God will increase or become more likely?
> (7) Are there any members of the jury panel who have any relation to the following: St. Phillips Senior Citizens Organization; Garden Memorial Presbyterian Church, 1700 block of Minnesota Avenue, SE; Safeway at Naylor Gardens; Navy Yard?

gious faith in identifying appellant, he agreed, over government objection, to include all seven questions proffered by appellant. He specifically reasoned that the potential answers thereto would provide appellant with a foundation for challenges for cause and peremptory challenges.

The court declined defense counsel's invitation to ask all the questions of the jurors as one and to take their answers individually. Viewing the suggested procedure to be excessively time consuming and totally out of perspective, the court chose to present the questions to and receive answers from the jurors as a group. If any persons had difficulty answering, or desired privacy, or further questions were necessary to elicit a proper response, the individual could then be interrogated at the bench by either the court or counsel.[5]

Viewing the *voir dire* proceeding as a whole, defendant and counsel were provided with ample opportunity to satisfy themselves of the impartiality of the jury. All questions proffered by the defense were posed. The court also expressly granted counsel the option of calling jurors individually to the bench when further questioning appeared necessary. The manner in which the *voir dire* proceeding was conducted did not constitute an abuse of the trial court's discretion.

### III

⬛ Appellant's second claim of prejudice arising from the admission of testimony regarding the belief of witnesses Rowe and Roache that he burglarized their apartment is meritless. The record clearly demonstrates that this issue was raised initially by the government on direct examination

only after defense counsel and prosecutor discussed the matter and the former agreed to the government's treatment of the matter on direct. Moreover, the sole objection made by the defense referred to the specific testimony as to the basis for the witnesses' belief, *i.e.,* that a young neighbor had identified appellant as the burglar, and not to their general testimony that they believed appellant had committed the burglary. By the time of this objection, even assuming it was valid, the door to this line of questioning was wide open.[6] Appellant's agreement to the course of questioning estops him from claiming prejudice therefrom. *Cf. Middleton v. United States,* 401 A.2d 109, 127 (D.C.1979) (applying doctrine of curative admissibility to permit cross-examination of defendant regarding prior conviction after introduction on direct). Further, whatever prejudice may have arisen from this interrogation was dispelled by the court's *sua sponte* instructions on the limited purpose of the subject line of testimony.

### IV

⬛ Our review of appellant's third assertion of error: prosecutorial misconduct during rebuttal argument, raised for the first time on appeal, is three-tiered. We first evaluate for misconduct the asserted examples of improper comment. If we find that misconduct occurred, we then determine whether the erroneous statements rose to the level of "substantial prejudice." *Dyson v. United States,* 418 A.2d 127, 132 (D.C.1980). As appellant failed to oject at trial, we will reverse his conviction only if this substantial prejudice so clearly prejudiced his substantial rights as to jeopardize the very fairness and integrity of his trial.

---

5. The court also denied the defense request to strike for cause all jurors responding affirmatively to question 5, *see* note 4, *supra,* but agreed to call such jurors to the bench to permit further inquiry. Any issues engendered by this adopted procedure were rendered moot by the lack of an affirmative response to the question.

6. This was true even as to the specific testimony which the objection addressed. The fact that Rowe learned a neighborhood youth had identified appellant as the burglar was first elicited during cross-examination in an attempt by defense counsel to establish bias.

*Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc).

■■■■■ Appellant recounts three examples of misconduct, principal amongst which is the use of inflammatory language during summation. On rebuttal, the prosecutor stated:

> We have heard now . . . 469 reasons why Mr. McCowan isn't guilty. We heard them from his lawyer. Perhaps Mr. McCowan takes the lead from him—it seems like [defense counsel] gives us a shotgun approach to the whole defense
>  . . . .

This comment was unprovoked by defense counsel's generally proper closing.[7] We view the particular statement referenced above as more than merely "an unfortunate choice of terminology under the circumstances" and "an isolated statement in an otherwise proper rebuttal argument." Granting the government the benefit of the doubt that this comment was unintentionally inflammatory, its expression was, at the least, improper.

■■■■■ Appellant also claims that the prosecutor erroneously represented to the jury during argument that he bore a burden of proof regarding his inability to explain his whereabouts on July 8. Our reading of the record indicates, to the contrary, that the prosecutor's argument was directed at the unreasonableness of appellant's limited attempts to ascertain his whereabouts. It did not assert, explicitly or implicitly, that appellant was burdened with proving his

whereabouts. *Cf. Whalen v. United States,* 379 A.2d 1152, 1165 (D.C.1977) (prosecutor's closing is proper where it refers to appellant's inability, prior to trial, to explain his whereabouts to a co-worker and does not refer to appellant's failure to testify at trial), *rev'd on other grounds,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980). Indeed, the argument merely rebutted defense counsel's statement in closing that appellant's actions were reasonable. *See Burkley v. United States,* 373 A.2d 878, 881–82 (D.C.1977). The court, moreover, instructed the jury several times that appellant bore no burden of proof. We presume the jury understood and followed those instructions. *Smith v. United States,* 315 A.2d 163, 167 (D.C.), *cert. denied,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974).[8]

■■■■ Appellant further claims prejudice from the prosecutor's allegedly inflammatory comment to the effect that the jury's verdict could not bring back Unit or Dallas Crossley, "[b]ut don't you [the jury] think they will hear?" While we agree that this comment was indeed inflammatory as well as an example of "a distasteful cliche-type argument," *Harris v. United States,* 131 U.S.App.D.C. 105, 108, 402 F.2d 656, 659 (1968), we note that it directly responded to an analogous comment by defense counsel in closing. Having provoked this response, appellant may not claim prejudice therefrom. *See Medina v. United States,* 315 A.2d 169, 170 (D.C.1974). We emphasize, nonetheless, that such conduct of counsel, prosecution and defense, we do not condone.

---

7. Contrary to the government's assertion in its brief, defense counsel did not say that Rowe and Roache were lying. Counsel merely stated, albeit in somewhat harsh terms, an obvious conclusion: "And for you to believe that Allen McCowan—I repeat—is not guilty, you have got to believe that she and her brother are lying."

 We don't condone defense counsel's later improper statement that the government witnesses "have convicted themselves." Nevertheless, we also cannot accept the government's assertions that this isolated comment ameliorates

the egregiousness of its own inflammatory language in closing.

8. Notwithstanding the silence of both parties, we voice our concern with the apparently improper manner in which this "reasonableness' argument was made, and rebutted. *See United States v. Jacobs,* 134 U.S.App.D.C. 198, 413 F.2d 1105 (1969) (jury should not be instructed to weigh the evidence in light of their experiences as citizens in the community); Criminal Jury Instructions for the District of Columbia, No. 2.02 (3d ed. 1978).

■ Looking beyond appellant's cited examples of misconduct, we find additional error in the prosecutor's continual expression of his personal opinion of appellant's credibility.[9] We have consistently "admonished lawyers to eschew personal opinions in the course of arguments to juries because this can divert jurors from their role." *Dyson v. United States, supra,* 418 A.2d at 130 (citing cases). We continue to do so here. The truthfulness of a witness is for the jury, not counsel, to decide. *Id.*

Although all attorneys are presumed to know the rules of the court and are expected to abide by them, *see Miller v. United States,* 444 A.2d 13, 16 (D.C.1982), the prosecutor during both closing and rebuttal arguments offered the jury his view of appellant's veracity. We cannot state more emphatically that such expressions of personal opinion are improper and offend the dignity of the court. They should not be tolerated.[10]

■ Finally the prosecutor referred the jury to a specific question asked of appellant on cross-examination, requested the jury to recall the "funny" look on appellant's face and his hesitation in attempting

to answer,[11] and then characterized appellant's responses to the court that he could not answer as "the closest he ever got to telling the truth."[12] In so characterizing appellant's comment, the prosecutor not only again asserted his opinion of appellant's credibility, but also "exceeded the bounds of permissible comment by invading the province of the jury's responsibility to assess the demeanor of witnesses." *Dyson v. United States, supra,* 418 A.2d at 130.

■ Having determined that misconduct does exist in the prosecutor's closing argument, we evaluate whether it constitutes "substantial prejudice" so clearly prejudicing appellant's substantial rights as to jeopardize the very fairness and integrity of his trial. *See id.* at 132; *Watts v. United States, supra,* 362 A.2d at 709. To determine "substantial prejudice," the test we apply is:

Whether we can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." The decisive factors are the closeness of the case, the centrality of the issue af-

---

**9.** Throughout closing argument the prosecutor stated:

He [appellant] didn't tell you the truth about anything. We will never know.

\* \* \* \* \* \*

[W]hen Allen McCowan took that oath, it meant nothing to Allen McCowan. He gets up there and says whatever he wanted. He could answer the question four different ways.

\* \* \* \* \* \*

Then you have Allen McCowan getting up there and making a fool of himself, telling you things that nobody could believe.

**10.** "We remind that a prosecuting attorney plays a special role in our judicial system." *Dyson v. United States, supra,* 418 A.2d at 130 (quoting *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), regarding the peculiar two-fold role of a United States Attorney).

**11.** In response to the prosecutor's question, "Mr. McCowan, why did you have to shoot the

man? Why didn't you just rob him?", appellant replied, "Your honor, I can't answer that question." The court then asked appellant whether he understood and whether he heard the question—to which appellant affirmatively replied and reasserted his inability to respond to the question. Thereupon, the prosecutor terminated his cross-examination.

**12.** The prosecutor argued:

Remember when he was asked the question, "why did you have to shoot the man? Why didn't you just rob him?"

I am sure looking at him you remember the funny look he got on his face. Just a minute, didn't you think he was going to tell us? Didn't you think that just at that minute he was going to—then he looked past and he looked up at the Judge and said, "I can't answer that question."

He never did answer the question. That is the closest he ever got to telling the truth.

fected by the error, and the steps taken to mitigate the effects of the error. *Gaither v. United States,* 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)); *see Dyson v. United States, supra,* 418 A.2d at 132.

Applying this standard, we note that these comments occurred during closing argument, principally in rebuttal, and were followed by the court's extensive instruction to the jury. Twice, the court advised the jury that it alone determined the credibility of witnesses and, once, that in determining the facts of the case from the evidence, the statements and arguments of counsel are not evidence. The court further instructed specifically that "the defendant has a right to become a witness in his own behalf. His testimony should not be disbelieved merely because he is the defendant."

Appellant faced a strong, albeit circumstantial, government case. Two eyewitnesses testified to his presence at or near the scene of the shooting. Their identifications were certain and unwavering. Two other witnesses testified to his confession of the shooting shortly after it occurred. Appellant's defense primarily attempted to undercut the reliability of the eyewitnesses and the credibility of the confession witnesses. His own testimony added little substance.

In balancing the strength of the government's case and the remedial instructions given by the court against the gravity of the prosecutor's misconduct, appellant's failure to object weighs against him. On the record before us, we do not find this misconduct to have substantially swayed the judgment of the jury, much less jeopardized the very fairness and integrity of appellant's trial.

*Affirmed.*