**Keith M. JAMES, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 88–1431.

District of Columbia Court of Appeals.

Argued April 11, 1990.
Decided Sept. 19, 1990.

---

Carol Steiker, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Margaret A. Flaherty, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Helen M. Bollwerk and G. Paul Howes, Asst. U.S. Attys., were on the brief, for appellee.

Before FERREN, BELSON and TERRY, Associate Judges.

FERREN, Associate Judge:

A jury convicted appellant of first-degree premeditated murder while armed, D.C. Code §§ 22-2401, -3202 (1989), first-degree felony murder while armed, *id.*, first-degree burglary while armed, D.C.Code §§ 22-1801(a), -3202 (1989), and carrying a pistol without a license, D.C.Code § 22-3204 (1989). Appellant's primary arguments on appeal arise from the fact that the government did not turn over to the defense a statement to the police by Essie Bowman, an eyewitness to the shooting, until the fifth day of a six-day trial. The statement revealed that Gary Augustine, an unavailable witness, had told Bowman,

among other things, to remove the murder weapon from the scene immediately after the shooting. Two trial days before the government disclosed this evidence, the court had admitted as a spontaneous utterance another statement by Augustine (to Jean–Robert Baptiste), identifying appellant as the shooter. It is undisputed that Augustine made his supposedly spontaneous exclamation identifying appellant as the shooter *after* he had told Bowman to remove the weapon. Thus, the statement to Bowman, which the government withheld until the fifth day of trial, casts serious doubt on whether the later statement identifying appellant as the shooter was truly spontaneous and thus properly exempt from the rule against hearsay.

Appellant argues that the prosecutor had a duty to disclose this evidence at an earlier point in time under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), as well as an ethical duty to do so. Appellant stresses that "the prosecutor's failure to disclose this information in a timely fashion led to the erroneous admission of hearsay testimony and interfered with the trial court's exercise of its discretion so as to violate Mr. James' confrontation clause and due process rights." Although appellant did not move for a mistrial or ask the trial court to revisit its spontaneous utterance ruling upon disclosure of Augustine's remarks to Bowman, we conclude that this failure does not bar appellant's claim here. Moreover, because the evidence of guilt in this case was not overwhelming, and because we cannot determine as a matter of law whether the evidence disclosed would have affected the trial court's hearsay ruling and the outcome of the trial, we remand the record for a trial court decision on whether its hearsay ruling would have been different had it considered the later-disclosed evidence and, if so, whether there is a reasonable probability that the result of the trial would have been different.[1]

---

1. We find no merit in appellant's argument that his conviction should be reversed because of several allegedly improper statements made by the prosecutor in his closing argument. Appellant did not object to any of the statements at trial, and we therefore would reverse his convic-

## I.

On January 18, 1988, shortly before 2:00 p.m., Ben Johnson was shot three times in a northwest Washington apartment that was used to sell drugs. He died from his injuries before police arrived on the scene a short time later. One eyewitness, Essie Bowman, identified appellant as the man who shot Johnson. Bowman testified that she was sleeping on the couch in the apartment when she heard someone knock on the door. She turned over to see who was there, and when she saw "it was Keith," she turned back over because she was familiar with appellant. She then heard a "pow." She turned back over to see appellant shooting Johnson. Bowman testified that, as appellant was shooting Johnson, Johnson was trying to run into the bathroom. Bowman further testified that, after the shooting, there was a struggle between appellant and Gary Augustine, who was also in the apartment. Augustine hit appellant's hand; appellant dropped the gun; and appellant hit Augustine in the eye and ran out of the apartment. Bowman testified that, after appellant left, she removed from the apartment the murder weapon and another gun and gave them to a man she knew as "Six Fingers."[2] Although Bowman maintained that it was her decision "to give [the guns] to the police," she admitted that Augustine had told her to remove the guns from the apartment.

Gary Augustine's close friend, Jean–Robert Baptiste, testified that, at about two

tion only if the prosecutor's misconduct "so clearly prejudiced his substantial rights as to jeopardize the very fairness and integrity of his trial." *McCowan v. United States,* 458 A.2d 1191, 1196–97 (D.C.1983) (citing *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc)).

During closing argument, the prosecutor stated: "[B]efore we paint the Government's witnesses as to the low life that you might want to believe they are, well, let's stir everybody in and let's begin from common ground, because that's where we are." The prosecutor then stated: "Keith James told you in his own words, [he] participated in a robbery and did his own little robbery at the same time." Before rebuttal argument, the trial court called counsel to the bench and *sua sponte* warned the prosecutor not to repeat the above argument. Appellant now argues that the prosecutor's comments "urged the jury to draw inferences of criminal propensity and bad character" and that the court had an obligation to issue curative instructions *sua sponte.* We agree that the comments were improper; however, we find no plain error in the court's failure to instruct, particularly in light of the fact that appellant's counsel did not request any such curative instruction from the court, even after the court had pointed out the impropriety.

Appellant argues, in addition, that three different statements by the prosecutor asked the jury to draw impermissible inferences from the fact that appellant chose to terminate a pre-arrest interview with the police, in violation of appellant's rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Having read each of the cited statements in context, however, we agree with the government that the remarks were not necessarily intended to comment on appellant's termination of the interview. Each statement could reasonably be read to ask the jury to draw a permissible inference. *See Donnelly v. DeChristoforo,* 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431

(1974) ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning"); *Boyd v. United States,* 473 A.2d 828, 833 (D.C.1984) (court must determine whether language used was such that jury would "naturally and necessarily" take it to be comment on failure to testify).

Finally, appellant argues that the prosecutor asked the jury to draw impermissible inferences from appellant's failure to testify and thereby attempted to place the burden on appellant to explain his innocence. Appellant cites the prosecutor's repeated use of the phrase "he can't explain" apparently referring to appellant's inability to "explain" certain testimony offered by government witnesses. As the government points out, however, the prosecutor slipped back and forth between saying "he can't explain" and "you [the jury] can't explain." Given this context, the prosecutor's statements need not be read as a comment on appellant's failure to testify, but rather as an inartful way of arguing that appellant's defense had not created a reasonable doubt, in light of the government's evidence. *See Donnelly,* 416 U.S. at 647, 94 S.Ct. at 1873. Moreover, appellant's counsel had previously requested that the court *not* give the standard instructions on the defendant's failure to testify and did not change that request in light of the prosecutor's statements in closing. Thus, we do not agree with appellant that it was plain error for the court not to give such instructions. In sum, none of the statements cited by appellant so clearly prejudiced his substantial rights as to jeopardize the fairness and integrity of his trial. *See McCowan,* 458 A.2d at 1196–97.

**2.** Using information provided by Bowman, the police recovered a .22 caliber pistol (presumably the murder weapon) from "Six Fingers" and another gun, a .38 caliber Derringer, from Baptiste.

o'clock that afternoon, he encountered Augustine outside the apartment. According to Baptiste, Augustine was "shaking" and "scared" and said: "John, John, John, Keith shot at Ben." [3] Baptiste immediately went inside the apartment and found Johnson lying on the bathroom floor. Baptiste asked Augustine to call an ambulance. The others then left the apartment, while Baptiste waited alone for the ambulance and the police to arrive.

According to government witnesses, two days before the shooting, on January 16, 1988, Johnson, Augustine, Baptiste, and appellant had participated together in the theft of approximately fifteen pounds of marijuana.[4] The government's theory was that appellant killed his long-time friend, Johnson, in a dispute over how to divide the stolen marijuana. It introduced evidence from several witnesses that there had been such a dispute between appellant and Johnson and that appellant was looking for Johnson during the 36 hours that preceded the shooting. It also introduced evidence that, after the shooting, both Jacqueline Johnson (the victim's sister) and Keith Travers (a close friend of appellant) called appellant to see if he had shot Ben Johnson. To both inquiries, appellant responded he had not shot Johnson. When Rosslyn Marshall, Travers' girlfriend, informed Travers that she had seen appellant on Euclid Street on the afternoon of the shooting,[5] Travers called appellant again and confronted him with the information. Appellant first admitted and then denied seeing Marshall on Euclid Street.[6] The government also introduced evidence of appellant's apparent lack of concern or sorrow after his good friend had been shot; the government argued at length in its closing that this was evidence of appellant's guilt.

Appellant did not testify. The defense's theory was that appellant was not present when Johnson was shot and that the government's witnesses identifying him as the shooter were unreliable and biased. The defense did not dispute appellant's participation in the marijuana theft but elicited testimony that, despite a disagreement about how to divide the stolen marijuana, appellant did not appear angry with Johnson during the time between the theft and the murder. The defense also argued that appellant's stake in the drug theft was small compared to that of Jean Baptiste, and that Baptiste had a greater motive to kill Johnson because Johnson disagreed with Baptiste's plan to lace the marijuana with PCP and sell it. The defense also argued there was no physical evidence to support the government's theory. Indeed, none of the latent fingerprints recovered from the scene of the shooting matched those of appellant, and swabs of appellant's hands, taken approximately seven hours after the shooting, did not reveal any chemical elements consistent with the recent discharge of a firearm.

The main focus of the defense was to impeach the credibility and the motives of the government's two main witnesses, Baptiste and Bowman, as well as the motives of the absent Augustine.[7] In particular,

---

3. Although Baptiste's first name at times appears in the transcript as "John," a notation in the transcript states that the correct spelling is "Jean."

4. The theft involved three separate raids on the same apartment. Apparently, Augustine and Baptiste were involved in only the first instance, which netted one pound of marijuana. Appellant and Johnson then returned to the scene and stole a trash bag that they believed contained marijuana, but that turned out to contain only clothing. Appellant and Johnson then returned to the scene a third time, this time stealing a trash bag that contained thirteen one-pound bags of marijuana and five quarter-pound bags.

5. Johnson's apartment was located at 1013 Euclid Street, N.W., about a seven minute walk from the apartment where he was killed, located at 1429 Girard Street, N.W.

6. On re-direct examination, Travers changed his testimony slightly, stating that appellant first denied seeing Marshall and then admitted seeing her.

7. The government proffered that Augustine had left the District and gone to New York soon after the shooting. Augustine had returned to the District to testify before the grand jury, to attend a witness conference, and to meet with the prosecutor in preparation for trial. He was under subpoena for the trial but apparently had

the defense impeached Essie Bowman, the government's only eyewitness, on the following grounds: (1) she removed the murder weapon and another gun from the scene of the shooting; (2) when she spoke to the police two days after the shooting, she could give no name, nickname, or description of the shooter; (3) she was high on cocaine on the day of the shooting; (4) the government had promised her immunity for any criminal acts she might have committed on the day of the shooting; (5) she expected the government to assist her in several pending criminal matters in exchange for her testimony; and (6) she was friends with both Jean Baptiste and Gary Augustine, both potential suspects in the shooting.

## II.

This case centers around several statements attributed to Gary Augustine, who was unavailable for trial and did not testify. See *supra* note 7. One of his statements was admitted on the third day of trial. Jean Baptiste testified that Augustine had said: "John, John, John, Keith shot at Ben." Before the court admitted this hearsay statement, there was considerable discussion at a bench conference about whether the statement qualified as a spontaneous utterance. *See generally Price v. United States*, 545 A.2d 1219, 1225–27 (D.C.1988). The trial judge took a brief recess to read several cases involving spontaneous utterances, after which he permitted a lengthy voir dire of Baptiste in order to allow the government to lay the foundation for admitting a spontaneous utterance. Baptiste's testimony shed no light on the question of Augustine's state of mind between the time of the shooting and the time

Augustine encountered Baptiste. Accordingly, the court's only comment on the "spontaniety" of Augustine's utterance was: "[I]t seems to me circumstantially from his testimony there isn't too much concern about the time element here; is there? I mean, he is there before the police are there and the body is still bleeding in the bathroom." The court eventually ruled that the statement was admissible as a spontaneous utterance.

Later, on the fifth day of trial, the government disclosed to the defense Essie Bowman's statement to the police,[8] the relevant portion of which was as follows:

I turned around and Mike[9] and Gary had the gun and there was another gun in the house. Mike then put them (the guns) into a jacket and that's when Gary said. "No, man, forget that." *Gary said: "Don't leave the gun in here or him"* (meaning Ben). *"Let's get them out of here."* I told Mike don't touch nothing. I said this gun needs to go to the police and I [am] getting ready to call them. That's when I ran out with the two guns in a gray jacket. As I was going out of the door I was running to use somebody's phone.... I turned back around to go get my coat, and *Gary yells: "Don't go back in there."*

(emphasis added; punctuation supplied and modified, in part) Augustine's apparent instruction to Bowman—"Don't leave the gun in here"—was used by appellant's counsel during cross-examination of Bowman and in closing argument in an attempt to impeach the credibility and the motives of both Bowman and Augustine.

Appellant argues on appeal that the government had a duty under *Brady* to disclose Bowman's statement to the police

---

disappeared. The prosecution had enlisted police detectives in New York to look for him with no success.

**8.** The government disclosed this evidence as part of its obligation under the Jencks Act, 18 U.S.C. § 3500 (1988), which requires the prosecutor to disclose upon request, after direct examination of a government witness, any statement of the witness in the government's possession which relates to the subject matter of the witness's testimony. The record does not indicate at what point before Bowman's cross-exam-

ination the government disclosed Bowman's statement. Appellant's brief represents that the statement was provided to defense counsel "shortly before Bowman testified." The government represents, in its brief, that the statement "was disclosed to defense counsel after [Bowman's] direct examination."

**9.** Michael Palmer was in the bathroom of the apartment smoking marijuana at the time of the shooting and was unable to identify the shooter.

in a more timely fashion, presumably before trial or at least during the hearsay discussion on the third day of trial. Appellant argues he was prejudiced by the government's "untimely" disclosure because Bowman's statement—which revealed that Augustine had made several remarks to Bowman after the shooting but *before* Augustine's statement to Baptiste—was relevant to determining whether Augustine's statement to Baptiste that "Keith shot at Ben" was indeed a spontaneous utterance. Appellant maintains that Augustine's statements to Bowman "clearly indicated his capacity to reflect and bring considerations of self-interest to bear" and also revealed "his motive to fabricate about the shooting." As a result, appellant argues, Augustine's later statement to Baptiste could not have been spontaneous and therefore should not have been admitted as a matter of law. Appellant contends that the improper admission of this hearsay statement was a violation of his sixth amendment right to confront witnesses against him. In essence, appellant argues, Gary Augustine testified against appellant without being subject to cross-examination, yet his statement was admitted without the indicia of reliability attributable to an actual spontaneous utterance. *See generally Ohio v. Roberts*, 448 U.S. 56, 65–68, 100 S.Ct. 2531, 2538–40, 65 L.Ed.2d 597 (1980). Moreover, he argues, this erroneous admission cannot be deemed harmless because "Gary Augustine's out-of-court statement effectively doubled the government's identifications of Mr. James as the shooter." [10]

Alternatively, appellant argues that even if Augustine's statements to Bowman would not automatically render his later statement to Baptiste inadmissible, "the prosecutor's failure to disclose Ms. Bowman's expected testimony to the Court nonetheless violated Mr. James' right to due process by preventing the Court from exercising its discretion." Appellant cites *Johnson v. United States*, 398 A.2d 354, 364 (D.C.1979), as support for the proposition that he is "entitled as a matter of due process to have the trial court properly exercise its discretion—in light of *all* the facts—in making its determination." (emphasis in original)

### III.

■ This case differs from most *Brady* cases because the evidence at issue here was disclosed during trial, not after. As a result, had defense counsel recognized, at trial, the relevance of the disclosed evidence to the previous spontaneous utterance ruling, she could have moved the court either to revisit the issue or to grant a mistrial. Defense counsel here did neither. As a threshold matter, therefore, we must explore some of the possible implications of defense counsel's failure to raise this matter at trial and decide whether that omission poses any bar to appellant's claim on appeal.

We first address the possibility that defense counsel recognized the relevance of the disclosed evidence to the spontaneous utterance ruling and made a tactical decision not to pursue a mistrial at that time but, instead, to keep the particular jury impanelled in hope of an acquittal. If we were convinced that such a tactical decision had been made, we would in all likelihood conclude that appellant had waived his right to an appeal on that issue. *See Towles v. United States*, 521 A.2d 651, 655–56 (D.C.) (en banc) (where it was clear that counsel's failure to pinpoint double jeopardy as basis for objection was tactical

---

**10.** Appellant also argues that, independent of any *Brady* obligations, the prosecutor violated his ethical duties by giving a "selective presentation of the facts" within his sole possession when called upon by the court to make a proffer on the spontaneous utterance question. If we were convinced that the prosecutor had recognized the relevance of the evidence in question to the spontaneous utterance issue and consciously withheld the information from both defense counsel and the court, we would agree with appellant that there was an ethical breach. We note, however, that, upon disclosure of the evidence, defense counsel apparently did not recognize the evidence's relevance to the previous spontanous utterance ruling; nor, as far as we can tell, did the court ever recognize its relevance to the hearsay ruling. We therefore find no basis to conclude that the prosecutor recognized the evidence's relevance to the spontaneous utterance issue and intentionally withheld the evidence from the court.

choice, "tactics amounted to a waiving of double jeopardy"), *cert. denied*, 483 U.S. 1008, 107 S.Ct. 3236, 97 L.Ed.2d 741 (1987). The government does not contend, however, that the defense made such a conscious tactical choice. Moreover, given our refusal to conclude that the prosecutor must have seen the relevance of this evidence to the spontaneous utterance question, see *supra* note 10, and also given the fact that the court apparently did not recognize the relevance of this evidence to the previous spontaneous utterance ruling, we will not conclude that defense counsel must have recognized its relevance and made a tactical decision not to pursue the matter.

Another possibility is that, even had the evidence been disclosed earlier, defense counsel still would not have recognized its relevance to the spontaneous utterance claim. The prosecutor, of course, had the same evidence prior to trial and apparently did not recognize its relevance to the hearsay question. See *supra* note 10. Nonetheless, given the fact that upon sufficient reflection after trial, defense counsel recognized the evidence's relevance to the spontaneous utterance ruling, we see no basis to conclude that, given the same time to reflect before trial, defense counsel would not have achieved the same insight.[11]

■ We next consider whether—in light of the fact that more time to reflect on the disclosed evidence would have enabled defense counsel to recognize its relevance to the earlier hearsay ruling—it was incumbent upon defense counsel to request a continuance in order to evaluate properly the evidence's relevance. In *Frezzell v. United States*, 380 A.2d 1382, 1385 (D.C. 1977), *cert denied*, 439 U.S. 931, 99 S.Ct. 319, 58 L.Ed.2d 324 (1978), a case that also involved a *Brady* claim about evidence that was disclosed during the course of the trial, we stated that "once the report ... was turned over to the defense, it was then incumbent upon counsel to request a continuance in order to make use of the information." The report at issue in *Frezzell* revealed the existence of a witness, previously unknown to the defense, who had given a description of the assailant whom he had observed leaving the scene of the crime that varied significantly from the defendant's actual appearance. *Id.* at 1384. Because the trial court in *Frezzell* had ruled the eyewitness's description memorialized in the report was inadmissible hearsay, *id.*, it was immediately apparent that the defense could make use of the information only if it requested a continuance to locate the witness so he could testify in person. In contrast here, it was not apparent from the nature of the evidence disclosed that a continuance would be required to make full use of it or that more time and reflection would reveal its relevance to a previous evidentiary ruling. Indeed, given the fact that we have accepted appellant's premise that the relevance of this evidence was only apparent after time for reflection, it would be anomalous, to say the least, for us to rule that it was incumbent upon defense counsel to request a continuance immediately.

■ In addition to the reasons stated above, there is a more fundamental reason why we do not conclude that appellant has waived his claim. If we were to impose upon defense counsel the obligation, every time Jencks material is disclosed, see *supra* note 8, to evaluate—or to request a continuance in order to evaluate—the material's relevance not only to the witness who is testifying, but also to every witness who has previously testified, the result would be that a prosecutor's *Brady* obligations would extend no further than the requirements of the Jencks Act. That is to say, the prosecutor could withhold evidence material to various evidentiary rulings during the course of the trial and ultimately, perhaps, to the outcome of the trial as long as the evidence was eventually disclosed to the defense as Jencks material. At that point the burden would be on the defense to evaluate the evidence's relevance to every previous evidentiary ruling in the trial, or else waive the right to complain later. We do not read *Brady* or the due process

---

**11.** Although appellant is represented by different counsel on appeal from his trial counsel, both attorneys are members of the Public Defender Service.

clause so narrowly that they would allow such a result. In sum, appellant's failure to move for a mistrial or to ask the court to revisit its spontaneous utterance ruling does not bar his claim here. Accordingly, we move to the merits of appellant's *Brady* claim.

## IV.

A defendant's right to due process is violated if the prosecution withholds evidence specifically requested by the defense that is material either to guilt or to punishment, *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97, or if the prosecution withholds unrequested evidence that is obviously exculpatory, *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976). The test to determine whether evidence is "material" to guilt or "obviously exculpatory" is essentially the same:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).[12]

The government argues that, because appellant neither moved for a mistrial nor asked the trial court to revisit the spontaneous utterance ruling upon disclosure to the defense of Augustine's statement to

Bowman, "the issue here is whether the trial judge's failure to strike the evidence *sua sponte* after hearing Bowman's cross-examination was plain error." This argument is premised on the same notion we rejected in Part III. We have already decided that defense counsel could not have been expected, upon disclosure, to recognize the relevance of this evidence to the earlier hearsay ruling. See *supra* Part III. Accordingly, we see no reason to conclude that appellant's claim here is subject to plain error review. Moreover, appellant does not claim the trial court erred but, rather, that the government violated his right to due process. We have noted in another context that the task of determining constitutional materiality for *Brady* purposes is conceptually different from the task of determining trial court error. See *Davis v. United States*, 564 A.2d 31, 41–42 (D.C.1989) (en banc). The issue here is not whether the trial court committed plain error but whether the timing of the government's disclosure of Augustine's statement to Bowman violated appellant's due process rights because the timing of the disclosure was "material" to the outcome. *Cf. Agurs*, 427 U.S. at 110, 96 S.Ct. at 2401 ("If the suppression of evidence results in constitutional error, it is because of the character of the evidence ...").[13]

As *Bagley* makes clear, the standard for determining materiality is the same whether or not the evidence at issue was specifically requested.[14] *See Bagley*, 473 U.S. at

---

**12.** The above quotation appears in Part III of Justice Blackmun's opinion in *Bagley*, which only Justice O'Connor joined *in toto*. Although three other members of the Court concurred in the judgment without joining Part III, the concurrence agreed with Justice Blackmun's formulation of the standard of materiality quoted above. *See Bagley*, 473 U.S. at 685, 105 S.Ct. at 3385 (White, J., concurring) ("I also agree with JUSTICE BLACKMUN that for purposes of this inquiry, 'evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' ").

**13.** Moreover, the issue is not whether the trial court committed plain error by failing *sua sponte* to declare a mistrial; had the court done so, it might well have violated appellant's double jeopardy right to "the verdict of a tribunal

he might believe to be favorably disposed to his fate." *See United States v. Jorn*, 400 U.S. 470, 486, 91 S.Ct. 547, 558, 27 L.Ed.2d 543 (1971). Had the court recognized the relevance of the disclosed evidence to the previous spontaneous utterance ruling, the proper course would have been to bring the matter to counsel's attention and to require defense counsel to decide whether to move for a mistrial or to waive any claim of prejudice and submit the case, as tried, to the impanelled jury.

**14.** We note that in this case the defendant made a specific pretrial request for "the name and address of the person from whom the government obtained the alleged murder weapon and any other persons known to the government who had possession of this gun at or around (before or after) the time of the shooting." A hearing on appellant's *Brady* request was held

682, 685, 105 S.Ct. at 3383–84, 3385. The ultimate question, therefore, is whether the statements at issue were "material" to the outcome of the trial.[15] *See id.*

We begin with the observation that this was not a case in which the evidence of guilt was overwhelming. If this were such a case, no great analysis of the spontaneous utterance question would be required; we would simply say that, even if Augustine's hearsay statement had been excluded, the result of the proceeding would not have been different. *See, e.g., Frezzell,* 380 A.2d at 1385 (in light of "overwhelming testimonial evidence," it could not be said that "any exculpatory description of a witness who gave a name and address that could not be traced would have created a reasonable doubt as to guilt"). This case, however, from our reading of the record, appears to have been a close one. The physical evidence was inconclusive. The jury's verdict, therefore, necessarily depended entirely on the credibility of the government's witnesses. Only one of those witnesses, Essie Bowman, actually testified that she saw appellant shooting Johnson. Moreover, Bowman's credibility was impeached by the defense on a number of grounds. The only other evidence placing appellant near the scene of the crime around the time of the shooting was testimony that Rosslyn Marshall saw appellant on Euclid Street—the street where Johnson lived, a seven minute walk from where he was shot—between one and two o'clock on the afternoon of the shooting. Although the government established a plausible motive for appellant to kill Johnson—disagreement over how to divide the proceeds of a marijuana theft—that motive apparently would also apply to both Baptiste and Augustine, as appellant argued to the jury.

Indeed, from all appearances, defense counsel seemed to expect an acquittal; having apparently damaged Essie Bowman's credibility on cross-examination, defense counsel announced the defense would put on no witnesses, contrary to an earlier statement to the court that the defense was tentatively planning to present five witnesses.

■ We are faced, therefore, with two crucial questions: (1) would earlier disclosure of Bowman's police statement have had any effect on the court's spontaneous utterance ruling? If so, (2) is there a reasonable probability that the exclusion of Augustine's statement to Baptiste would have changed the outcome of this apparently close trial? Accordingly, we turn to the court's spontaneous utterance ruling.

We agree with appellant that Augustine's statements to Bowman immediately after the shooting—including "Don't leave the gun in here"—were relevant to a proper determination of the admissibility of Augustine's later statement to Baptiste— "Keith shot at Ben"—as a spontaneous utterance. A trial judge could interpret Augustine's statements to Bowman as evidence that Augustine had had time to reflect on the shooting and to consider his own self-interest. If such a finding were made, we would agree with appellant that a later statement could not be admitted as a spontaneous utterance. *See United States v. Kearney,* 136 U.S. App. D.C. 328, 333 n. 11, 420 F.2d 170, 175 n. 11 (1969) (in deciding whether statement made after shocking event was spontaneous, "what must be taken into account is not only the length of the intervening time period but also an assessment of the declarant's activities and atti-

---

before Judge Harriett Taylor on the day before trial began. After listening to an ex parte proffer by the prosecution about the chain of custody of the gun, Judge Taylor denied appellant's *Brady* motion, stating:

I don't see, based upon that [the prosecutor's ex parte proffer] or upon anything else that I have heard here, how the information sought would be exculpatory or even would lead to exculpatory evidence within the meaning of *Brady* and the motion to compel will be denied.

15. *Bagley* recognized that impeachment evidence falls within the *Brady* rule. *See Bagley,* 473 U.S. at 676, 105 S.Ct. at 3380. Appellant argues at length that the statement at issue revealed the potential bias of Bowman and Augustine. As appellant acknowledges, however, the government's midtrial disclosure enabled him to use the statement to argue to the jury that Bowman and Augustine were biased.

tudes in the meanwhile"). On the other hand, we cannot agree with appellant that Augustine's statment to Baptiste would automatically be inadmissible. A trial court could also interpret Augustine's statements to Bowman as evidence not of reflection, but of panic. If that were the case, then Augustine's statements to Bowman might themselves be deemed spontaneous utterances, and nothing would preclude a ruling that Augustine's statement to Baptiste, presumably only a few missues later, was also a spontaneous utterance.

The fact that we do not know what effect Augustine's statements to Bowman would have had on the trial court's spontaneous utterance ruling is noteworthy, because it highlights the unusual procedural posture of this case in comparison to most *Brady* cases. In the typical *Brady* case, the defense discovers evidence (in the government's possession) after trial and then files a motion for a new trial, *see, e.g., Agurs*, 427 U.S. at 110, 96 S.Ct. at 2400–01; *Davies v. United States*, 476 A.2d 658 (D.C. 1984), or a motion to vacate sentence, *see, e.g., Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383–84. In those circumstances, the trial court has the opportunity to review the claim in the first instance and either to rule on the basis of the pleadings or to hold an evidentiary hearing and then rule on the question of materiality. Our review of such a trial court ruling is deferential. *See Derrington v. United States*, 488 A.2d 1314, 1339 (D.C.1985) ("Where the trial court has determined that asserted *Brady* material would not have materially affected the verdict, the reviewing court is limited to a determination of whether that decision is reasonable....") (footnote omitted) (citing *Davies*, 476 A.2d at 661), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 201 (1988). In this case, appellant did not make a new trial motion or a motion to vacate sentence but, rather, raised the *Brady* claim for the first time on direct appeal.

While appellant was not required to bring a motion for a new trial before rais-ing his *Brady* claim on appeal, the fact remains that, had he done so, we would now have a definitive answer from the trial court on the hearsay ruling. We do not believe that appellant's choice not to file a post-trial motion should preclude us from seeking such a ruling before deciding the outcome of his appeal. Given the fact that the hearsay question cannot be resolved as a matter of law, we believe the proper course is to remand the record to the trial court to determine whether Augustine's statement to Baptiste would still have been admitted as a spontaneous utterance had the court known about Augustine's previous statements to Bowman. *See Davis*, 564 A.2d at 42 (when incomplete record hinders appellate court assessment of harmlessness of trial court error, proper procedure is remand for purpose of supplementing record, after which "matter is returned to [appellate] court"). The trial court may, in its own discretion, rule on the basis of the written statements alone or conduct a voir dire of Bowman or any other witness in order to make a proper ruling.[16]

Having decided that we will remand the record so that the trial court can revisit its evidentiary ruling in light of later-disclosed evidence, another question remains: whether, in the event the court rules it would not have admitted Augustine's statement to Baptiste as a spontaneous utterance, the trial court should also make a ruling on the materiality of Augustine's statement— "Keith shot at Ben"—to the outcome of the trial. In most remand contexts, we do not seek trial court input on the question of the harmlessness of errors that may have occurred during trial. *See Davis*, 564 A.2d at 42. We have noted, however, that the *Brady/Bagley* context is conceptually different, because in those cases the trial court is not reviewing the harmlessness of its own error but rather the constitutional materiality of the prosecution's suppression of evidence. *Id.* at 41–42. Indeed, in this particular case, we believe the trial judge is better situated than we are to evaluate

---

**16.** This result should dispose of appellant's claim that his due process rights were violated because the trial court did not have an opportu-nity to consider all the relevant facts when making its hearsay ruling.

what effect Augustine's statement to Baptiste may reasonably have had on the jury's verdict. Accordingly, we perceive no reason not to seek the trial court's ruling on the constitutional materiality question in the event that the court determines its evidentiary ruling would have been different. There is no question that we would have the authority to make a materiality ruling without any trial court input on the question. *See Frezzell,* 380 A.2d at 1385 ("While the trial court did not consider the issue of materiality in the instant case, we comment upon the record"). Nonetheless, given that we are remanding the record in any event for reconsideration of an evidentiary ruling, we believe the best course in this case is to seek a trial court ruling on materiality at the same time, which we will then review under the deferential standard set forth in *Derrington.*[17]

*Record remanded.*

---

17. We are mindful of the fact that, should appellant ultimately not prevail in his contentions, in order to avoid a double jeopardy violation, we would remand the case to the trial court with instructions either to vacate appellant's first-degree felony murder conviction or to vacate his first-degree premeditated murder and first-degree burglary convictions. *See, e.g., Garris v. United States,* 465 A.2d 817, 823 (D.C.1983) (remand for resentencing where defendant convicted of felony murder and underlying felony), *cert. denied,* 465 U.S. 1012, 104 S.Ct. 1013, 79 L.Ed.2d 243 (1984); *see also Garris v. United States,* 491 A.2d 511, 514–15 (D.C.1985) (discussing policy behind remand procedure), *cert. denied,* 479 U.S. 993, 107 S.Ct. 595, 93 L.Ed.2d 595 (1986).