Howard WHITAKER, Appellant,

v.

UNITED STATES, Appellee.

No. 91–CF–674.

District of Columbia Court of Appeals.

Argued Sept. 9, 1992.
Decided Nov. 10, 1992.

Elaine M. Gordon, Public Defender Service, with whom James Klein, Elizabeth Taylor and Allie Sheffield, Public Defender Service, Washington, D.C., were on the brief, for appellant.

Peter H. White, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Roy W. Mcleese, III, William M. Blier, and Robert A. Meyer, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, and SULLIVAN, Associate Judge, and BELSON, Senior Judge.

ROGERS, Chief Judge:

Appellant, Howard Whitaker, appeals his convictions by a jury of mayhem while armed, D.C.Code §§ 22–506, –3202, assault with intent to rape while armed, id. §§ 22–501, –3202, assault with a dangerous weapon, id. § 22–502, and kidnapping. Id. § 22–2101.[2] On appeal, appellant raises the principal claim of error that he was denied due process when the government misrepresented and withheld evidence significant to the motion to compel a mental examination of the complainant and when the trial judge refused to hear significant evidence which would have raised a "red flag" demonstrating the need for that examination. Appellant also contends that the trial judge erred by instructing the jury on kidnapping as a lesser-included offense of kidnapping while armed, that the evidence of mayhem while armed and of assault with intent to rape was insufficient, and that his conviction of kidnapping merges with the convictions of assault with a dangerous weapon, assault with intent to rape while armed, and mayhem while armed. We affirm.

I

On September 27, 1988, the complainant was beaten, stabbed, and left in the 1700 block of First Street, S.W. Early the next morning, appellant discovered the complainant lying on the loading dock of Super Salvage, a scrap yard at 1711 First Street, S.W., where appellant had worked for seven years.

The government's evidence at trial showed that on the evening of September 27, 1988, the complainant changed into clean clothes and left her home to visit her friend Ann, who lived on Queen Street, N.E. After visiting with Ann, the complainant went around the corner into an alley, where she smoked PCP with two acquaintances named Donnie and Mike. After a short while, the complainant returned to Queen Street, where she saw appellant, whom she had known for one or two months. The complainant asked appellant to take her to McDonald's; when he agreed, the complainant got into appellant's car, a gray Ford with a burgundy interior, and they drove away.

Instead of taking the complainant to McDonald's, however, appellant drove her to Anacostia Avenue. There, the complainant tried to get out of the car, but appellant forced her back in. Appellant then agreed to take the complainant home, but instead drove past her house and over the bridge into Southwest Washington. Appellant stopped the car again, in an area where the complainant had never been before; all she could remember about the area was that there was a building to the right of where appellant parked the car and an iron fence.

The complainant testified that after appellant stopped the car, he told her that he wanted "some pussy." When she said "no" and tried to get out of the car, appellant hit her, pulled her back in, and, using a knife, began to unbutton her blouse. Thereafter, all that the complainant could remember was trying to unlock the car

---

2. Appellant was indicted on charges of kidnapping while armed, D.C.Code §§ 22–2101, –3202, and assault with intent to kill while armed, D.C.Code §§ 22–501, –3202, but was convicted of the lesser-included offenses of kidnapping and assault with a dangerous weapon. On May 15, 1991, appellant was sentenced to terms of imprisonment of thirteen years to life on the charges of mayhem while armed and assault with intent to rape while armed, five to fifteen years on the charge of kidnapping, and forty months to ten years on the charge of assault with a dangerous weapon, each to run concurrently.

door in an effort to escape.[3]

Paul Kaplan, the manager of Super Salvage, testified that on the morning of September 28, 1988, he opened for business at approximately 6:00 a.m. Appellant was working that day, and approximately five or ten minutes after opening he told Mr. Kaplan that he had heard a noise coming from the loading dock. Together, Mr. Kaplan and appellant went to the door from the building to the loading dock, unlocked and raised the door, and discovered the partially naked complainant lying on her back on the loading dock floor. Mr. Kaplan testified that the complainant's clothing was down around her ankles, that he "thought the young lady was raped," and that he "knew she was hurt, but [ ] didn't know how bad." Mr. Kaplan then called police.

Detective Robert Catlett of the Sex Offense Branch testified that he responded to the call from Super Salvage at approximately 6:30 a.m. that day, and that an ambulance and other police officers were already on the scene when he arrived. Detective Catlett saw the complainant was lying on the loading dock driveway wearing only her panties; her pantyhose were around her ankles and her bra and T-shirt were up around her neck. The complainant's face was swollen and bloody; her ear was cut, and she had a gaping hole in her left temple, which at first appeared to Detective Catlett to be a gunshot wound.

Detective Catlett also testified that he visited the complainant at D.C. General Hospital approximately fifteen times during the month·following the assault, but that she was unable to speak to him until October 26, 1988.[4] At that time, the complainant identified her assailant as "Junior," and described him as a heavy-set, dark-complected man who drove a small, gray, two-door car with a burgundy interior. The complainant later told the detective that she had known her assailant for over a month, that she had been out with him once, and that she had seen him on approximately ten different occasions during that period. On November 5, 1988, the complainant identified appellant from a photo spread shown to her by police; she also identified appellant's car from photographs shown to her.

The only physical evidence offered as linking appellant to the assault was a single red carpet fiber, which FBI Special Agent Wayne Oakes concluded came from the carpet in appellant's car. The fiber was found "in the debris" on a remnant of blue and white striped cloth in the area near where the complainant was found. The cloth, however, did not belong to the complainant.[5]

The principal defense witness was Dr. Jordan Grafman, who was employed by the National Institutes of Health and was Chief of the Cognitive Neuroscience Section at the National Institute of Neurologi-

3. The complainant testified that she did not remember engaging in sex at any time during the day prior to the assault.

4. Dr. Elwood McGhee, a trauma surgeon at D.C. General Hospital, testified that when the complainant arrived at the hospital her condition was "very critical," and that it was unclear whether she would survive. Dr. McGhee opined that some of the wounds on the complainant's face and body were consistent with having been inflicted by a knife, but that others were more consistent with some kind of blunt object. The complainant had a cut on her head which measured approximately ten inches in length, multiple fractures of her facial bones, swelling of the brain and a kidney injury. The complainant remained in intensive care for approximately two and one-half weeks, in D.C. General Hospital for two and one-half months, and in the National Rehabilitation Hospital for an additional two and one-half months.

5. Detective Catlett identified Government's Exhibit 11 as "two cut up items of clothing that were found to the left of where the complainant was found in the vegetation area on the incline, in the vegetation." Evidence Technician William Rull conducted a search of appellant's car on November 8, 1988, but found no evidence which might link appellant to the assault. The testing by Special Agent John Roy Brown of the FBI Serology Unit of various items of the complainant's clothing failed to reveal any blood of appellant's type; although there was semen found on the complainant's panties, he could not develop any identifying characteristics of the semen, including its age. Agent Oakes testified that an analysis of carpet taken from appellant's car failed to reveal any hair from the complainant. Nor was any hair from appellant discovered on any item of clothing worn by the complainant.

cal Disorders and Stroke. Dr. Grafman testified that he had reviewed the complainant's medical records, which showed "a moderate severity of head injury" resulting from injuries she sustained in the assault. Dr. Grafman opined that these injuries could result in behavioral disorders, problems with autobiographical memory and confabulation, which he described as the usually unintentional fabrication by a person who has suffered an injury to fill in memory gaps. The fabrication occurs because of the person's tendency to "confuse his autobiographical memory," and "to put in events they didn't necessarily experience." [6] Dr. Grafman stated that the complainant's medical records showed that she suffered at least some posttraumatic amnesia and mild confabulation.[7]

The defense also called Sergeant Lorraine Kittrell of the Metropolitan Police Department, who testified that she visited the complainant in the hospital on October 7, 1988. Sergeant Kittrell had been contacted by the hospital on that day because it appeared that the complainant was able to talk. When Sergeant Kittrell "attempted to ask [the complainant] who sexually assaulted her ... she appeared to say 'Ed-

ward.'" However, Sergeant Kittrell testified, she "[couldn't] be sure, because of the condition that [the complainant] was in, what she was saying." The complainant had clearly suffered brain damage and could only murmur, her jaw being wired, and the officer did not know if the complainant knew what was being asked of her.[8]

## II

Appellant contends that he was denied due process and a fundamentally fair trial "because the trial [judge's] refusal to reopen the hearing on his motion for a competency examination of the complaining witness, coupled with the government's misrepresentation and withholding of evidence significant to that motion, created an unacceptably high risk that he was convicted on the testimony of an incompetent witness."

Appellant's defense focused primarily on the competency—in particular, the cognitive functioning and memory loss—of the complainant. On January 30, 1990, after receiving the complainant's medical records showing the extent of the injuries she suf-

6. Dr. Grafman said of confabulation:

   For example, [the patient] might embellish a story to such a degree that characters are reported present when they weren't there, or they might be sitting, for example in a courtroom like we are now, but claim adamantly that, in fact, they are at work and I have to go back to work, despite what they see around them.
   This is in the most severe cases and doesn't happen all the time, but it is present.

   The doctor further testified that:

   I am not talking here about embellishment. I am talking about if someone had a nice suit on versus a plain jacket; those kinds of details perhaps not existing in the story. We are talking about if the story was related to a restaurant, they will talk about going to a movie theater and elaborate details about going to the movie theater.

   The doctor also expressed the opinion that it "would be an unusual report," "paradoxical, contrary to the typical pattern," for the complainant to say that she could remember the events surrounding the trauma but not much of anything earlier in the day or the night before.

7. On cross examination, over defense objection, the government impeached Dr. Grafman with

his testimony at the hearing on the motion to compel a competency evaluation that he had seen no evidence at that time of confabulation in the case, and that it was not really relevant. At that time the doctor had not seen the December 5, 1988, report. The December 5 report included an analysis of the complainant's complex perceptual construction which stated, among other things: "very poor recall of a ¶ length story 13 units of 17 unit P), lacking in recall of detail and mild confabulation noted; immediate recall of complex figure was good." The prosecutor's further cross-examination indicated that the doctor had not seen the December 5, 1988 report when he stated there was no evidence of confabulation and that it might not be relevant.

8. Appellant also presented the testimony of Mr. Leslie Gould, a salesman for Unifirst Corporation, the company that supplied uniforms to Super Salvage. Mr. Gould testified that sometime during the fall of 1988, he was asked by appellant's employer to examine all of appellant's uniforms for blood; he did so, but did not discover blood on any of the uniforms. Mr. Gould was unable to remember exactly when he inspected the uniforms, only that it was sometime in either September, October or November of 1988.

fered in the attack, the defense filed a motion to compel the complainant to submit to a pretrial mental and neurological examination. The defense argued that an examination was justified by the fact that the complainant had smoked an unknown quantity of phencyclidine (PCP) on the day of the assault and had suffered severe head injuries during the assault itself. The defense theory was that because of her serious injury, the complainant had unintentionally "confabulated," *i.e.*, substituted appellant, with whom she was acquainted before the attack, and who found her the morning after the attack, for her real assailant.

A hearing on the motion to compel a mental examination was held September 10, 1990, before Judge Mildred M. Edwards.[9] Dr. Grafman testified, based upon his review of the complainant's medical records available at that time, that he observed significant impairment in her cognitive functioning, and suggested additional testing to assess the degree of her memory impairment.[10] He explained, however, that confabulation was a relatively rare occurrence that followed only massive head trauma, and that he was uncertain whether it was relevant to the complainant's case.[11] It was his opinion that a two month posttraumatic amnesia "would suggest, quite a severe injury...." Because the identification occurred during the state of posttraumatic injury, Dr. Grafman testified "it's very crucial that the testing is done to rule out familiarity alone as being the basis for identification...." The doctor acknowledged, however, that the medical records indicated that the complainant had largely recovered from the trauma, and her thought processes were logical and coherent, and her visual memory showed average performance as did her problem solving ability.[12] In addition, Dr. Grafman admitted that while further testing would "shed more light" on the accuracy of the complainant's recollection of the assault, it would only "shed some light" and not pro-

9. The hearing was held although the defense had not received a copy of the first of two neurological evaluations of the complainant (dated December 5, 1988). Judge Edwards advised defense counsel that the hearing could be reopened if the December 5, 1988, evaluation, once received, proved significant to the motion to compel an examination.

10. Dr. Grafman suggested testing that involved questioning the complainant about personal and cultural events prior to the assault in order to determine whether her recollection of them was good or bad. He was of the opinion that the medical records did not show adequate testing of the degree of amnesia. He explained that the amnesia was for recent events, that while explicit memory can be quite impaired, implicit memory may be normal, and "that the further you're out from the injury, the less period of time prior to the injury you tend to forget." He also explained source amnesia and temporal memory problems and stated that they are associated with frontal injuries or frontal trauma. The doctor stated that he would want to test the complainant for both kinds of problems.

11. At the time, the doctor had not seen the December 5, 1988, report, which referred to "mild confabulation." *See* note 7, *supra.* The doctor indicated that he nevertheless would "have to be a little concern[ed] that the identification [of appellant] was made within the period of posttraumatic amnesia" (or disorientation, and problems in remembering day to day

events, attention span). He admitted, however, that he did not really know when the complainant had emerged from posttraumatic amnesia.

12. In response to Judge Edwards' question about what could be learned by further testing of the complainant now, the doctor conceded that without adequate notes by a person at the time two years ago when the complainant made her identification of appellant, "it might be quite difficult" to determine whether the identification was the product of suggestiveness as a result of the posttraumatic amnesia phase that the complainant was in at the time. Still, the doctor thought that the court "would certainly have a little bit better notion of what the situation was like that day, especially with other information regarding day-to-day functioning."

With regard to the reliability of the complainant's photo identification of appellant five weeks after the assault, Judge Edwards asked a hypothetical question which recounted the complainant's familiarity with appellant, including his nickname, and her account of the events leading up to the assault. In response, Dr. Grafman stated that he was still concerned about the identification because he was unaware of how the prior examination was done, what questions were asked and understood, whether she was able to speak freely or was prompted, and the fact that source amnesia would permit a good memory of the fact she went out with a person but not correctly place it in time.

vide definitive evidence of the trustworthiness of her testimony.

The government presented no witnesses. In its oral and written opposition to appellant's motion, the government argued that nothing in the record overcame the presumption against court-ordered mental examinations of witnesses.[13] Judge Edwards, having stated that the absence of corroborative evidence was not a dispositive issue and noting that the doctor could not say with certainty that an additional evaluation would conclusively establish the level of the complainant's recollection, denied appellant's motion.[14]

On the day before the scheduled February 20, 1991 trial, the government provided defense counsel with a copy of the December 5, 1988, neuropsychological evaluation.[15] Defense counsel thereafter filed, on the new trial date, February 25, 1991, a pretrial motion for reconsideration of the motion to compel a mental and neurological examination based on recently disclosed evidence and alleging that on February 22, 1991, the government informed defense counsel that the complainant had made a prior identification of her attacker as "Edward." Defense counsel represented to the trial judge, Judge Morrison, that Dr. Grafman had found significant the evidence that there had been a prior identification. The trial judge declined to reopen the

hearing on the motion to compel an examination and to review the transcript of the hearing before Judge Edwards. The trial judge also denied defense counsel's renewed request for a cognitive functioning evaluation of the complainant after the complainant had testified at the hearing on the motion to suppress identification, based on her memory problems.[16] Before trial, defense counsel also renewed the motion to reopen the hearing on the motion to compel on the ground that the December 5 evaluation disclosed that the complainant had confabulated, thereby supporting the defense theory that she was confabulating when she identified appellant. The trial judge also denied this motion.

Appellant now contends that he was "denied a fundamentally fair trial" because of the trial judge's refusal to reopen the hearing on his motion to compel a neurological examination and that the government's misrepresentation and withholding of significant evidence created "an unacceptably high risk that he was convicted on the testimony of an incompetent witness." He maintains the trial judge could not properly exercise his discretion because he refused to consider crucial evidence of the complainant's prior confabulation and initial identification of her attacker as "Edward." Further, he argues that neither the trial nor motions judge could properly exercise

**13.** The government maintained that (1) the complainant had consistently related the events of the attack and the identity of her assailant, citing her affidavit in support of an arrest warrant and her grand jury testimony; (2) the complainant's medical records contained no suggestion that she suffered any neurological injury of the kind that would justify appellant's request; and (3) there was significant other evidence tying appellant to the attack on the complainant, including the discovery of the complainant behind appellant's place of employment and the carpet fibers from appellant's car that matched fibers removed from the complainant's blouse. At trial, during the government's opening statement to the jury, the prosecutor stated, for the first time, that the fiber had been found in the area of the complainant's body on a shirt cloth remnant that did not belong to the complainant.

**14.** During argument on the motion, following the doctor's testimony, Judge Edwards distinguished between the issue before her—whether an additional neurological evaluation was need-

ed in order for the trial court to determine whether the complainant was competent to testify at trial—and whether the complainant's identification was suggestive, the latter being a matter that could be addressed in a motion to suppress. Judge Edwards also noted the difference between the issue before her and the doctor's interest as a professional in having additional information about the complainant's memory.

**15.** Appellant's motion for a new trial states that the defense was not given the December 5, 1988, report until after 5 p.m. on February 19, 1991.

**16.** The complainant failed to recall any interviews with the police other than the photo array or much of the day prior to the incident or the evening before; she also could not recall whether she had sexual intercourse with anyone the day prior to the assault. The trial judge viewed these matters as properly for the jury to consider in evaluating the complainant's testimony.

discretion because the government had misled the trial court about the consistency of the complainant's identification of appellant and the existence of corroborating physical evidence. He contends that he was substantially prejudiced because his motion to compel and his motions for reconsideration were denied based on the view that the complainant's identifications had been consistent and were corroborated by physical evidence.

■ The issue before the trial judge in ruling on the defense motions to reconsider the denial of the motion to compel an examination or to reopen the hearing on that motion was whether appellant had proffered materially new facts to warrant reconsideration. *Cf. United States v. Davis*, 330 A.2d 751, 754–55 (D.C.1975) (ruling on motion to suppress is law of case and may be reconsidered only if "significant new facts or the defendant's prior unawareness of grounds for such a motion"); *Jenkins v. United States*, 284 A.2d 460, 463–64 (D.C. 1971) (same). *See generally Kleinbart v. United States*, 604 A.2d 861, 866–67 (D.C. 1992) (discussing law of case doctrine). The trial judge concluded, in denying the defense motions, that the complainant's utterance of what sounded like "Edward" was hardly dispositive of whether there was, in fact, an identification of another person as the attacker, particularly where the complainant knew and later identified appellant by his nickname ("Junior"), by his car and by the location where she met him. The trial judge denied the defense motion to reopen the hearing because the judge disagreed with defense counsel's view of the significance of the complainant's failure to recall the exact number of photos in the array or her total discussion with the detective when "lying in a hospital bed, having been severely injured, with her mouth wired shut because her jaw was fractured;" the judge considered the failures to be "totally unremarkable." Finally, when the trial judge denied the defense renewal of the motion to compel an examination or to reopen the hearing, the judge had reviewed the records and concluded that the limited reference to confabulation in the December 5, 1988 evaluation was an insufficient reason for reconsideration or for ordering an evaluation.

In retrospect, it appears that the trial judge's original suggestion, that the motion for reconsideration should be addressed to Judge Edwards, would have been preferable. Clearly, it would have avoided some of the problems which the defense faced at trial. The delayed receipt by the defense of information about the complainant's initial "Edward" identification, the true fiber evidence, and the December 5, 1988 report resulted in having the motion to reconsider, and subsequent renewals by the defense of a motion for an examination, addressed on the trial date by a judge who had not presided during the evidentiary hearing on the motion for an examination. It is clear from the record that there was originally some misunderstanding by the trial judge of the nature of the contention underlying the defense motions and of the significance of Dr. Grafman's motions testimony in light of the new information about the "Edward" identification and the December 5, 1988 report.

■ We need not decide, however, if the trial judge abused his discretion by denying the defense motion for reconsideration (as well as the motion to reopen the motions hearing and the renewed request for an evaluation) without reviewing the neurological examinations and Dr. Grafman's testimony before Judge Edwards.[17] *See Unit-*

---

17. Given the opportunities that the trial judge afforded defense counsel to advise him of the significance of the doctor's testimony before Judge Edwards, it is difficult to fault the trial judge for not reading a transcript in order to determine what was of significance in the doctor's testimony. Advising of the significance of the testimony was defense counsel's responsibility. Although, at one point, counsel was well on her way to stating it, she never finished her sentence, concluding instead that she was not an expert. On the other hand, defense counsel was not in the best position to be fully prepared since the government had only disclosed the new evidence very shortly before the trial date. Under these circumstances, defense counsel's failure to have a well-articulated argument is understandable. *Cf. James v. United States*, 580 A.2d 636, 643 (D.C.1990). Furthermore, as the trial judge later acknowledged, Dr. Grafman's testimony had to be read closely. *See infra.*

ed States v. Crosby, 149 U.S.App.D.C. 306, 308, 462 F.2d 1201, 1203 (1972) ("Only by expenditure of reasonable time and effort in an exploration of all the facts and circumstances may the trial judge exercise sound discretion;" refusal to read medical records held an abuse of discretion) (footnotes omitted); Johnson v. United States, 398 A.2d 354, 364 (D.C.1979) (informed choice among alternatives requires a determination based on "a firm factual foundation"). By the time the judge denied the defense post-trial motion for a new trial—which raised arguments about the need for a mental examination and due process violations as a result of untimely disclosure of the December 5, 1988 report and the fiber evidence—the trial judge had reviewed Dr. Grafman's testimony before Judge Edwards; indeed, in denying the post-trial motions the judge noted that he had twice read the hearing transcript, with Dr. Grafman's testimony, and stated that "I think I understand [the defense] arguments." The judge had also heard Dr. Grafman's testimony at trial. The court has recently reviewed the law regarding compelling a mental examination of a witness, see Mitchell v. United States, 609 A.2d 1099 (D.C. 1992), and the difficulty that appellant faces here arises from the weight of the presumption against ordering a mental examination in view of the complainant's prior examinations.[18]

In denying the motion for a new trial, the judge noted that defense counsel had never asked for a competency hearing, and that he knew of no requirement that the government offer medical evidence to prove competency. The judge stated that he viewed the complainant to be a competent witness.

See Hilton v. United States, 435 A.2d 383, 387 (D.C.1981) (elements of competency). Finding no Brady[19] violations, the judge stated that he differed with the defense about the significance of the December 5, 1988, report. He noted that, out of all the medical reports, there were two words "mild confabulation" mentioned in connection with the complainant's ability to recall a paragraph she had read. The judge concluded that the reference to "mild confabulation" was "of little or no significance, at least it's not of the kind of blockbuster outcome determinative potentially signicance [sic] that [defense counsel] views it as." He found support in Dr. Grafman's testimony before Judge Edwards for the conclusion that the two words in the report simply represented "a passing reference." Commenting that Dr. Grafman's testimony required close reading, the trial judge referred to specific pages of the doctor's testimony as indicating that confabulation involved gross distortions of reality and was an extreme example of what can happen with frontal lobe lesions.

■ Had the complainant not previously been subjected to two prior neurological examinations, our conclusion in this case might well be different. See Crosby, supra, 149 U.S.App.D.C. at 308, 462 F.2d at 1203. It is clear that the defense posture in arguing the motion to Judge Edwards would have been stronger had the defense known of the "Edward" identification, the true fiber evidence and the information in the December 5, 1988, report. Cf. Wilson v. United States, 606 A.2d 1017, 1023–26 (D.C.1992) (breach of prosecutorial promise regarding defendant's impeachable convic-

We agree that Dr. Grafman's testimony is not readily summarized, as it deals with complex concepts and areas of uncertainty.

As the proceedings before the trial judge continued, defense counsel made clear the significance of Dr. Grafman's testimony, but by that time the focus of the proceedings had shifted to appellant's motion to suppress the identification. In that connection the trial judge could properly conclude that evidence suggesting problems with the complainant's memory were properly for the jury to consider, assisted by Dr. Grafman's testimony.

18. See id., citing Collins v. United States, 491 A.2d 480, 484 (D.C.1985), cert. denied, 475 U.S. 1124, 106 S.Ct. 1646, 90 L.Ed.2d 190 (1986). Appellant also does not challenge Judge Edwards' denial of his motion. Cf. Kleinbart, supra, 604 A.2d at 866–67 (law of case); Joseph v. Parekh, 351 A.2d 204, 205 (D.C.1976) (on motion for reconsideration under Super.Ct.Civ.R. 60(b), court is not required to determine the merits of underlying action, but is only to decide whether there has been an abuse of discretion).

19. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

tions prejudiced defense). It is also clear that defense counsel would have been in a better position to argue in support of the motion to reconsider. Timing is not an insignificant issue. *See James v. United States*, 580 A.2d 636, 644-7 (D.C.1990) (due process issue presents question of whether timing of disclosure was "material" to outcome; in absence of filing of a motion for new trial permitting trial court to rule, record remanded). In addition, there was expert testimony that a person who was confabulating would appear normal, and hence further testing was required.

But this case does not involve a motion to compel an initial mental examination, and the information about "Edward," the fiber and the December 5, 1988, report was available to the defense to use during trial. Consequently, upon review of the record, we are satisfied that the trial judge's reasoning in denying the motion for a new trial reflects an appropriate exercise of discretion, *see Johnson, supra*, 398 A.2d at 365 ("within the range of permissible alternatives"), based on a review of everything the defense relied on in seeking a third neurological examination of the complainant. *See James, supra*, 580 A.2d at 644 (review of trial court ruling on evidentiary materiality is deferential) (citing *Derrington v. United States*, 488 A.2d 1314, 1339 (D.C.1985) ("reviewing court is limited to a determination whether [trial judge's materiality] decision is reasonable")). This conclusion is bolstered by the trial judge's other reasoning, in denying the motions for reconsideration and to reopen, regarding the "Edward" identification and the fiber evidence. The trial judge's discussion of

Dr. Grafman's testimony during consideration of the post-trial motions indicates that he not only understood appellant's contentions but he appreciated the limitations to the doctor's conclusions that formed the basis for Judge Edwards' denial of the motion for another neurological examination.[20]

Appellant's *Brady* arguments are, ultimately, unpersuasive. The trial judge found that neither the fiber report nor the December 5, 1988 report were *Brady* material. As our discussion indicates, neither the fiber report nor the December 5, 1988 report provided exculpatory evidence in the classic sense.[21] *See James, supra*, 580 A.2d at 644 (*Brady* evidence is "evidence that is obviously exculpatory,") (citing *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976)). On the other hand, both offered some support for the defense motion to compel an examination. *See Collins, supra*, 491 A.2d at 485 (citing *United States v. Akers*, 374 A.2d 874 (D.C.1977)). *Cf. Martin v. United States*, 606 A.2d 120, 128 (D.C.1991) (severance required where evidence, although not conclusively exculpatory, "could reasonably show that a fact is slightly more probable than it would appear without that evidence") (internal quotation and citation omitted). The lateness of the information placed the defense in the less advantageous position of having a hearing without having all of the information to support its motion to compel an examination. The misrepresentations regarding the carpet fiber evidence are, therefore, clearly serious.[22] The defense

---

20. While the early misunderstanding by the trial judge of the evidence in support of the defense motion to compel an examination was clearly regrettable, there is no merit to appellant's suggestion on appeal that the trial judge "never really understood the issue presented by appellant's motion for a competency examination." Nor, contrary to appellant's suggestion, is there anything in the record to suggest that the trial judge denied the defense motions to reconsider and reopen simply because of considerations of judicial economy and expeditiousness.

21. The fiber report offered some corroboration, however weak, to the complainant's identification of appellant. The reference to "mild confa-

bulation" in the December 5, 1988 report was limited to the complainant's failure to recall a story she had read and, according to Dr. Grafman, its import was unclear in the absence of information about the tests that had been administered to the complainant.

22. Although the transcript of the hearing before the motions judge confirms that the prosecutor did not make an affirmative oral misrepresentation, the misrepresentation appears in the government's written opposition to the defense motion to compel a neurological examination, filed on February 15, 1990. Further, the prosecutor failed to correct defense counsel's statement to the motions judge, during argument on the mo-

was thus deprived of an argument in support of its motion, and the judge was left with a misunderstanding of the evidence at the time she ruled on the defense motion.[23] *See Wilson, supra,* 606 A.2d at 1023.

Still, it was not unreasonable for the trial judge to conclude that neither the fiber evidence nor the December 5, 1988 report provided a basis on which to find that the result of the judges' rulings would probably have been different. *See Bagley v. United States,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383–84, 87 L.Ed.2d 481 (1985); *James, supra,* 580 A.2d at 644. Judge Edwards made clear that her ruling on the motion would not turn on the presence or absence of corroborating physical evidence, and Judge Edwards' ruling did not rely on the fiber evidence. Further, defense counsel was able to make use of the limited corroborative nature of the fiber evidence at trial. The trial judge did not refer to the fiber evidence in addressing corroboration of the complainant's identification of appellant.

With regard to the December 5, 1988 report, the trial judge's conclusion that Judge Edwards' ruling on the motion to compel a further examination would not have been different had she known the contents of the December 5, 1988, report is supported by the record. In concluding that the defense had failed to demonstrate the need for an additional neurological

evaluation of the complainant, Judge Edwards relied not only on the fact that the complainant had given a consistent version of the facts, but also on Dr. Grafman's testimony that (in the judge's words) "he could not say with certainty that an additional neuropsychological evaluation could conclusively establish the level of [the complainant's] recollection." Judge Edwards also relied on the doctor's acknowledgement of "statements in the neuropsychological evaluation indicating that [the complainant's] visual memory is significantly better than her verbal memory and well within the normal limits as of early January 1989 when that assessment was made, some two months after the offense ... that may suggest that her capacity to remember what happened was not significantly impaired by the injury." Hence, the record does not permit us to conclude that Judge Edwards' evaluation of the significance of the December 5, 1988 report would have differed from that of the trial judge.[24] Moreover, after listening to Dr. Grafman testify at trial, after the doctor had reviewed the December 5, 1988 report, the trial judge concluded that the reference to "mild confabulation" in the December 5, 1988 report did not undermine the motions judge's reasoning in denying the defense motion to compel, and that, as a "passing reference," it did not persuade him of a need to reopen the hearing on the motion.[25]

---

tion, that the FBI had found a fiber from appellant's car on the complainant's blouse.

**23.** Appellant disputes that the fact that the defense had been provided with the FBI hair and fiber reports in January 1990, as well as a letter authorizing the defense to view the physical evidence, cured the harm, and we cannot tell since the reports are not part of the record on appeal. Appended to appellant's brief is a copy of an FBI report dated April 5, 1989, which states that a "carpet fiber was found in the debris removed from the Q6 shirt." The supplemental FBI report of May 19, 1989, is not more enlightening.

**24.** The trial judge, in denying appellant's renewed pretrial motion to compel an examination, stated that all the report indicated about confabulation was in connection with "seeing how much [the complainant] can repeat back as part of the testing process. * * * It just seems to me that, that those two words in everything that was written about [the complainant] and

her medical treatment and condition just don't rise to the level of significance that [defense counsel] thinks they do."

**25.** The findings by both judges that there was no prosecutorial misconduct is supported by the record and not clearly erroneous. The transcript of the proceedings before Judge Edwards makes clear that the failure timely to turn over to defense counsel the December 5, 1988 report was not because of the failure of the prosecutor's office, which, along with defense counsel, sought the trial court's help in getting the hospital to respond to a subpoena. Further, in opposition to the motion for a new trial, the government stated that the December 5, 1988 report was not in the custody or control of the United States, nor was its substance known to the United States, as of the date of the motions hearing and cited *Brady, supra* note 19, 373 U.S. 83, n. 19, 83 S.Ct. 1194, and *Gates v. United States,* 481 A.2d 120, 125–27 (D.C.1984), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985).

The nondisclosure of the "Edward" identification is more problematic, since the government had repeatedly argued that the complainant had consistently identified appellant as her attacker. Appellant states in his brief that the government had this information for over two years by the time of trial. Although there is nothing in the record to indicate when the prosecutor learned about the "Edward" identification, this is not necessarily dispositive. *See United States v. Brooks*, 966 F.2d 1500, 1502–03 (D.C.Cir.1992) (government has affirmative duty to search for possible sources of exculpatory information). The evidence directly contradicted the government's position that the complainant had consistently identified appellant, and in view of the defense confabulation theory, the government was required to turn it over to the defense. Still, we are unpersuaded that the trial judge erred in his evaluation of the nature of the evidence under the circumstances in which it was given and the qualified nature of the reporting officer's testimony about the initial identification.

Appellant's claim of prejudice to a fair trial only raises the issue whether the trial judge erred by refusing to order an additional neuropsychological evaluation to assist the trial court in evaluating the complainant's competency and to obtain information to assist the jury in assessing her reliability. Two such evaluations had already been performed. Those evaluations were available for defense counsel to use in day-of-trial pretrial motions and at trial.[26] In fact, defense counsel used the evaluations as well as Dr. Grafman's testimony in an attempt to undermine the reliability of the complainant's testimony. Thus, the jury (and the trial judge) heard Dr. Grafman's testimony about the complainant's confabulation, which he said "could be significant." Although defense counsel did not ask the doctor about the significance of the "Edward" identification, the prosecutor's questioning brought out that consistency did not preclude confabulation.[27] The jury also heard the doctor testify that the complainant appeared to have been subjected to "a generally, well-rounded neuropsychological test battery to try to assess a variety of cognitive functions," as well as his concessions on cross-examination.[28]

While the defense was unable to persuade either judge that the nature of the complainant's injuries and of confabulation required a third neurological examination of the complainant, because it was a condition that a jury could not determine for itself, the trial judge's conclusion is not, in view of expert testimony and other medical evidence, unreasonable. In addressing the defense post-trial motions, moreover, the trial judge found that the complainant was a competent witness, and we do not find "unmistakable evidence that the trial

The defense did not dispute these assertions. Although the government apparently could have provided the report to the defense somewhat more promptly (the government first received the evaluation on or after January 22, 1991, but did not provide it to the defense until February 19, 1991), the report would still have been unavailable at the September 1990 hearing before Judge Edwards. Also, the trial judge noted that the defense could have requested a subpoena for the record itself. The government had provided defense counsel with a letter of authorization for release of records. *See Brown v. United States*, 567 A.2d 426 (D.C.1989) (prior leave of court is required where D.C.Code § 14–307 applies).

**26.** Defense counsel did not request a continuance of the trial.

**27.** At trial, Sergeant Kitrell testified after Dr. Grafman.

**28.** The doctor distinguished between the kind of "mild confabulation" noted in the December 5, 1988 report and the type of confabulation that the doctor had described in connection with concern about the complainant's identification of appellant as her attacker. The doctor qualified his statements interpreting the December 5 evaluation because he did not have the raw test data that had been used as the basis for preparing the two neurological reports on the complainant. He conceded that the study of head injuries is an inexact science and a developing field, and the general difficulty of predicting how a particular person will react to a head injury. He also admitted that he could not say to any degree of certainty what the complainant's memory may have been of the events that led to her assault.

[judge's] impressions are defective." *Collins, supra,* 491 A.2d at 484 (quoting *Hilton, supra,* 435 A.2d at 388). Hence, in the posture of the instant case, after a trial court ruling on a motion for a new trial, *Vereen v. United States,* 587 A.2d 456 (D.C.1991) ("where the witness was currently experiencing mental irregularities"), is distinguishable. *See Mitchell, supra.* Likewise, appellant's reliance on the "red flag" of *Crosby, supra,* 149 U.S.App.D.C. at 308, 462 F.2d at 1203, is misplaced because the "red flag" was, in fact, inquired into by the trial judge, who reviewed the complainant's medical records and the doctor's testimony before Judge Edwards and also heard the doctor's testimony at trial, even asking the doctor some questions of his own.[29] *See Mitchell, supra,* 609 A.2d at 1106.

Under all the circumstances, therefore, in the absence of assurances that a third neuropsychological evaluation would have materially assisted the court or the jury in evaluating the complainant's credibility, we hold that the denial of an additional mental examination did not result in the denial of a fair trial. *See Albany v. United States,* 377 A.2d 1145, 1146 (D.C.1977).

## III

■ Appellant also contends that the trial judge erred by instructing the jury, over defense objection, on kidnapping as a lesser included offense of kidnapping while armed. He maintains that there was no "reasonable evidentiary basis on which the jury could [have found] [appellant] guilty of kidnapping yet entertain a reasonable doubt as to whether he was armed at the time." We find no error by the trial judge in concluding that a reasonable juror could have a doubt based on a reason with regard to the knife since the government's case was not that strong as to the knife, which was not used or mentioned at the time of the kidnapping.

The trial court may not submit a lesser included offense to the jury over objection "where the requisite disputed factual element is missing," and thus may not instruct the jury on a lesser included offense if there is not evidence from which the jury could rationally find that appellant committed the lesser included offense but not the greater. *See Glymph v. United States,* 490 A.2d 1157, 1160 (D.C.1985) (quoting *Lightfoot v. United States,* 378 A.2d 670, 672–73 (D.C.1977)). In the instant case, the jury was not compelled to find that appellant was armed with a knife when he kidnapped the complainant. Appellant never displayed the knife and the complainant never saw it during the initiation of the kidnapping. The jury could have had doubts about the complainant's testimony regarding the knife while accepting her other testimony about the attack and her identification of appellant. No physical evidence indicated that her blouse had been cut with a knife, and no knife of the kind she described was recovered from the scene or appellant's car. The examining physician testified that while some of the complainant's injuries "may be consistent with being cut," some were more consistent "with some sort of blunt force." That appellant did not seek to draw the "while armed" element into dispute is not determinative, since the jury has discretion to credit some testimony and discredit other testimony. *See Ballard v. United States,* 430 A.2d 483, 487 (D.C.1981). Hence, because the jury could rationally have had a reasonable doubt about whether appellant was armed at the time he kidnapped the complainant, we find no error by the trial judge in giving the lesser included offense instruction.[30]

## IV

Appellant's remaining contentions are either unpersuasive or meritless.

A. *Mayhem.* There was sufficient evidence of mayhem while armed, which re-

29. The defense did not proffer further expert testimony as part of its motion for a new trial nor ask the trial judge to hear additional expert testimony before ruling on the motion.

30. We need not consider whether an error in pressing a lesser included instruction over defense objection would have warranted reversal.

quires proof of a permanent disabling injury. *See Edwards v. United States*, 583 A.2d 661, 668 (D.C.1990) (citing *Wynn v. United States*, 538 A.2d 1139, 1145 (D.C. 1988)); *Smith v. United States*, 466 A.2d 429, 431–32 (D.C.1983) (mayhem involves disablement of normal functioning of human body, by contrast with malicious disfigurement which focuses on willful permanent disfigurement) (citing *Perkins v. United States*, 446 A.2d 19, 24 (D.C.1982), *McFadden v. United States*, 395 A.2d 14, 18 (D.C.1978), and *United States v. Cook*, 149 U.S.App.D.C. 197, 199, 462 F.2d 301, 303 (1972)). In *Foreman v. United States*, 506 A.2d 1124, 1126–27 (D.C.1986), the court held that in malicious disfigurement prosecution, the jury could reasonably infer from continued scars, despite extensive medical treatment, almost eleven months after assault that the disfigurement was permanent. Although the court has not heretofore so held with regard to mayhem, there appears to be no principled reason not to follow a similar rule. *See Cook, supra,* 149 U.S.App.D.C. at 200 n. 23, 462 F.2d at 304 n. 23 ("the infliction of an injury forbidden by a mayhem-type statute may constitute an offense notwithstanding the possibility that alleviation of the injury is medically possible"). There are times, notwithstanding the different elements of the offenses, *see Edwards, supra,* 583 A.2d at 668–69, when the distinction between mayhem and malicious disfigurement appears less than precise. *See Perkins, supra,* 446 A.2d at 26 (permanent disfigurement, for purposes of malicious disfigurement, means that the person was "appreciably less attractive or that part of his [or her] body is to some appreciable degree less useful or functional than it was before the injury").

■ The complainant described her injuries to the jury. She testified that she thought her ear had been cut because it still had a "knot" in it, and that she still bore scars from cuts over her eyes and on her chin. The complainant also testified that she had been paralyzed on her right side, and while she could now use her right arm and hand, she could not use it as well as she had before the assault. According to the complainant, she also could no longer write, type or hold onto things in the way she formerly did. The complainant also testified that since the assault the vision in her right eye had become blurry; she now wears glasses. The complainant was subject to cross-examination, and described her physical disabilities that existed more than two years after the assault.

There was also medical evidence about the extent of her physical injuries, including the very long period of intense medical treatment. *See* note 4, *supra.* In addition, there was testimony about the complainant's continuing course of rehabilitative efforts by medical and physical therapists.

Consequently, we agree with the trial judge that there was "a sufficient evidentiary predicate for a reasonable juror to find that something is permanently disabling." *See Edwards, supra,* 583 A.2d at 669 (permanent disabilities proved included impaired mental capacity and eyesight and restricted movement in victim's jaw). Contrary to appellant's contention, expert testimony is not always required to prove permanency. *Carr v. United States*, 531 A.2d 1010, 1016 n. 19 (D.C.1987) (victim's testimony and medical records sufficed to prove permanency in mayhem prosecution); *Foreman, supra,* 506 A.2d at 1126 (malicious disfigurement prosecution).

■ B. Assault with intent to rape. Similarly, there was sufficient evidence of specific intent to assault with intent to rape. As the government points out, the complainant's testimony about what appellant said to her ("he want[ed] some pussy"), that he used a knife to unbutton her blouse while asking to see her "valuables," and that the complainant was found the next day undressed with her pantyhose at her ankles and her bra and t-shirt at her neck and her panties stained with semen, sufficed to show specific intent. *Langley v. United States*, 515 A.2d 729 (D.C.1986).

■ C. Merger. Finally, appellant's conviction of kidnapping does not merge with his convictions of assault with intent to rape while armed, mayhem while armed, and assault with a deadly weapon. *See*

*Nelson v. United States*, 601 A.2d 582, 599 n. 35 (D.C.1991) (kidnapping and assault with intent to kill do not merge); *Byrd v. United States*, 598 A.2d 386, 389 (D.C. 1991) (en banc). The government correctly points out that each of the convictions stemming from the assault required proof that appellant was armed; the kidnapping conviction did not. Further, kidnapping required proof of asportation or confinement, while the other offenses required some form of assault.

Accordingly, we affirm the judgments.