*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 17-CF-1219

VICTOR ROGERS, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-830-17)

(Hon. Milton C. Lee, Jr., Trial Judge)

(Argued March 14, 2019    Decided September 30, 2019)[*]

*Sean R. Day* for appellant.

*Katherine M. Kelly*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney, and *Elizabeth Trosman, Peter V. Taylor,* and *Marisa S. West*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and GLICKMAN and THOMPSON, *Associate Judges*.

---

[*] The decision in this case was originally issued as an unpublished Memorandum Opinion and Judgment. It is now being published upon the court's grant of appellee's and one other motion to publish.

THOMPSON, *Associate Judge*:    A jury convicted appellant Victor Rogers of kidnapping while armed, assault with a dangerous weapon ("ADW"), first-degree sexual abuse, and assault.  In this appeal, appellant contends that (1) there was insufficient evidence to support the kidnapping and first-degree sexual abuse convictions; (2) the trial court plainly erred in failing to include a *mens rea* element in its instructions to the jury on first-degree sexual abuse; (3) the convictions for kidnapping while armed and ADW merge; and (4) his aggregate sentences for kidnapping while armed and first-degree sexual abuse violate the Eighth Amendment.  We affirm.

## I.

Appellant and complainant M.W., a married couple, had been homeless "pretty much [their] whole marriage[.]"  M.W. testified at trial that on January 12, 2017, appellant suggested that the two spend the night in M.W.'s U-Haul storage unit (which according to M.W., was against the U-Haul facility's rules).  M.W., wanting heat and shelter, agreed, and, at around 5:00 or 6:00 in the evening, appellant first locked her into the unit with her permission and then got into the

locked unit himself by climbing through the top of the unit and lowering himself into the unit.  The two sat in the storage unit quietly until after the facility had closed and "until maybe about [8:00 or 9:00], . . . just long enough for the manager . . . to get out of the building[,]" at which point appellant began to accuse M.W. of cheating on him with multiple men.  Even though M.W. denied appellant's accusations, appellant proceeded to beat M.W.'s head, arm, and back with a heavy, metal-tipped wooden pole that had been sitting in the storage unit, as he yelled vulgarities at M.W., calling her a "whore."  Appellant also beat M.W. with his fists, kneed her in her face, and "choked" her.  M.W.'s head and lip were "split . . . open" from the beating; her head, nose, and mouth were bleeding; her arm was "fractured" and was rendered "out of commission"; her arm, back and shoulders were bruised; and she was "in so much pain."  A clinician testified that M.W. also showed signs of strangulation, including, facial swelling and discoloration, subconjunctival hemorrhaging, and petechiae (ruptured capillaries) in her eyes and the back of her mouth.

The beating went on in the "dark" storage unit for more than an hour (and appellant broke the wooden pole in the process).  M.W. testified that in the cramped storage unit, "there was really no room to fight back."  When the beating stopped and appellant eventually went to sleep, M.W. "was scared he was going to

wake back up and keep [beating her], so [she] just stayed as quiet as possible and still." She needed to go to the bathroom, but "held [her]self." She testified that she knew she needed medical treatment, but could not get out of the unit.

M.W. testified that the next morning, appellant climbed out of the storage unit. He unlocked the unit to allow M.W. to smoke a few cigarettes and escorted her to the bathroom, but instructed her to put on a ski mask to cover up her injuries and to hold her head down. That (Friday) night, appellant's father, Willie Rogers, came to pick up appellant and M.W., drove them to a motel on New York Avenue, paid for a room for them, and gave them some money for food.

M.W. testified that Friday night in the motel was "peaceful[,]" and appellant left her alone to get them something to eat. M.W. told the jury that she did not try to escape or tell anyone what had happened to her because she "was in a lot of pain," "had to build up the nerve and the heart to leave," and "didn't want [appellant] to catch [her] trying to leave." M.W. testified that she did not want appellant to touch her but did not resist or protest having sex with appellant on Friday or Saturday because she "just wanted to just make peace" and "keep some peace." M.W. stayed in the motel room on Saturday even when appellant went out

again for food and "took a very long time to come back." She explained that she "was in so much pain[,]"[1] was hurting "[e]verywhere[,]" did not have "decent clothes[,]" and could not see because her "eyes were beat shut."

On Sunday, appellant began once again to accuse M.W. of engaging in sex acts with other men. Appellant "made [M.W.] get on [her] knees on the bed" and proceeded to have sex with her even though she "told him to stop [and that she was] in too much pain." M.W. testified that she was "afraid of getting punched and beat some more[,]" and "couldn't fight" appellant because she "didn't have but one arm," so "did it." After the sex act was over, appellant hit M.W. over the head with the T.V. remote control, breaking the device. Appellant then left the room, apparently heading for the manager's office to get a new remote control. M.W., who testified that she drew courage from a religious program she had been watching on T.V., then left the room wearing only a coat, underwear, and shower shoes, and eventually found help at the Fifth District police station. From there she was taken to the hospital to receive medical attention.

**II.**

---

[1] M.W. described her pain as a "10 plus" on a scale of 1 to 10.

In reviewing appellant's claim that the evidence was insufficient to support his armed kidnapping and first-degree sexual abuse convictions, we will "view the evidence in the light most favorable to the government, mindful of the jury's right to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Hughes v. United States*, 150 A.3d 289, 305 (D.C. 2016) (internal quotation marks omitted). We will reverse only if "the government . . . produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

Appellant's claim of instructional-error, which he did not raise in the trial court, is subject to plain-error review. *See Buskey v. United States*, 148 A.3d 1193, 1205 (D.C. 2016). To obtain relief on plain-error review, appellant must show (1) error, (2) that is plain or obvious, (3) that impacts substantial rights, and (4) that would, if not corrected, seriously impact the fairness, integrity, or public reputation of the judicial proceedings. *See United States v. Olano*, 507 U.S. 725, 732 (1993). "[P]lainness is assessed as of the time of appellate review regardless of the state of the law at the time of trial." *Malloy v. United States*, 186 A.3d 802, 815 (D.C. 2018) (internal quotation marks omitted).

We review merger issues and Eighth Amendment claims *de novo*. *Nero v. United States*, 73 A.3d 153, 159 (D.C. 2013); *Cook v. United States*, 932 A.2d 506, 509 n.2 (D.C. 2007) (Schwelb, J., concurring).

## III.

To prove that a defendant committed armed kidnapping, the government must prove that the defendant "while armed, intentionally seized, confined, or carried [the victim] away, and that [appellant] held or detained [the victim] against her will." *Kaliku v. United States*, 994 A.2d 765, 786-87 (D.C. 2010). A kidnapping can occur even where the victim voluntarily enters the space where she is subsequently confined. *See Davis v. United States*, 613 A.2d 906, 907, 912 (D.C. 1992). Appellant aptly summarizes the elements of kidnapping as requiring, in this case, proof that he "confined M.W. . . . on purpose, against her will, for a benefit." Appellant acknowledges that he locked the storage unit from the outside with M.W. inside the unit, but argues that there was no evidence that he did so with the purpose of confining M.W. against her will. Appellant emphasizes that the locking of the unit did not coincide with the assault, which happened hours later.

The trial court instructed the jury that to prove the kidnapping while armed charge, the government had to prove beyond a reasonable doubt that "on [Thursday] January 12th of 2017[,]" appellant "seized, confined, abducted or carried away M.W. against her will[,]" "did so voluntarily and on purpose, not by mistake or accident," "held or detained M.W. for the purpose of assaulting her[,]" and "at the time of the offense, . . . was armed with a dangerous or deadly weapon, in this case making reference to the piece of wood with metal at the ends . . . ." Thus, the court's instruction did not focus on the moment when appellant locked the storage unit; the court's reference to appellant's being armed with the wooden pole at the time of the offense conveyed that the charge related to the period of Thursday night when appellant beat M.W. (not to the time earlier that evening when M.W. consented to enter the storage unit and appellant locked her in from the outside). The court's reference to the date further conveyed that the charge did not relate to what happened on Friday, January 13, when appellant "bird-dogg[ed]" M.W. as she went to the restroom and smoked cigarettes outside the storage unit.[2]

---

[2] The verdict sheet shows that the jury convicted appellant of "KIDNAPPING WHILE ARMED (U-Haul [Thursday] Jan. 12, 2017)[.]"

We conclude that the evidence was sufficient to prove kidnapping while armed of M.W. in the U-Haul storage facility on January 12, 2017. The "while armed" portion of the charge was sufficiently proven by M.W.'s testimony that appellant beat her with the metal-tipped wooden pole (notwithstanding the fact, which defense counsel emphasized to the jury, that the government did not enter the pole into evidence).[3] As to the kidnapping aspect of the charge, M.W. confirmed in her testimony that she did not want to be in the locked storage unit with appellant during the beating. In addition, the jury heard testimony that over the course of about an hour in the darkness, in a cramped storage unit where M.W. had "no room to fight back" to try to escape or otherwise avoid injury, appellant beat M.W. until her eyes were swollen shut, impairing her vision. In the course of beating M.W., appellant also "fractured" her right arm, rendering it "messed up" and "out of commission"; a police officer who interacted with M.W. at the 5D police station testified that M.W. "couldn't really lift her arms up[,]" and even appellant recognized that her arm remained so injured by Sunday that she needed help to wash herself in the motel shower. The foregoing testimony permitted the jury to infer that any ability M.W. might otherwise have had during the beating to

---

[3] M.W. testified that appellant carried several bags of trash, including items with her blood on them and the broken stick, out of the storage unit before the couple left the storage facility to go to the motel.

escape by climbing out of the storage unit the same way appellant got in was impaired.

In short, the testimony established that by and during his actions that inflicted incapacitating injury on M.W., appellant on purpose confined and detained M.W. against her will, for the purpose of further assaulting her or for whatever other benefit he derived from beating her in a place where she was out of sight and beyond immediate rescue. That was enough to prove kidnapping. *Richardson v. United States*, 116 A.3d 434, 439 (D.C. 2015) ("[A]ll that is required is a 'seizing, confining' or the like and a 'holding or detaining' for ransom or reward 'or otherwise.'"[4]). And even though the charged confinement of M.W. while appellant was armed lasted only while the beating was going on, our case law is clear that "[t]he plain language of the [kidnapping statute] contains no exception" for cases in which the conduct constituting the kidnapping "is momentary or incidental to another offense." *Richardson*, 116 A.3d at 439; *see also id.* at 440-41 (declining "to construe the kidnapping statute to require an

---

[4] The indictment charged appellant with intending to hold and detain M.W. "for the purpose of assaulting [her,]" the prosecutor argued that appellant locked M.W. in the storage unit "with the aim of assaulting her [. . .]"; and the court used a similar phrase in its instructions. But the court also instructed that the confinement "may be for a purpose that the defendant believed might benefit him."

element of 'non-incidental' confinement, and to find the evidence insufficient to support [a] conviction[] if that element is not met"); *Hagins v. United States*, 639 A.2d 612, 617 (D.C. 1994) (rejecting an argument that the jury should have been instructed that it could not convict Hagins of kidnapping "if the alleged 'confinement' . . . was factually incidental to" the charged rape).

## IV.

D.C. Code § 22-3002(a) (2017) provides that a defendant commits first-degree sexual abuse if he "causes another person to engage in or submit to a sexual act . . . [b]y using force against that other person [or] [b]y threatening or placing that other person in reasonable fear that any person will be subjected to death, bodily injury, or kidnapping[.]" *Id.*, § 22-3002(a)(1), (2). We are satisfied that the evidence supported a finding that appellant caused M.W. to engage in a sexual act on the motel bed on Sunday, January 15, 2017, by placing her in reasonable fear that she would be subjected to (further) bodily injury if she resisted his effort to have sex with her. Stated differently, the jury could reasonably find, as the prosecutor urged, that appellant put M.W. "reasonably in fear that something like bodily injury . . . [was] going to happen to her if she d[idn't] submit."

M.W. testified that just before appellant made her get on the bed for sex, appellant began berating her again about sexual acts with other men, which was exactly what had preceded the beating in the storage unit. M.W. testified, "I didn't want him to hit me, so I did it." She was "afraid of being hit" and "afraid of getting punched and beat some more[.]" And right after the sex was over, appellant hit M.W. in the head with the T.V. remote control, validating her fear that he might hurt her. Appellant makes much of M.W.'s acknowledgment that she had sex with appellant without protest on the previous nights (to keep "peace") and M.W.'s testimony that she said to appellant just before the Sunday incident, "Baby, I don't care what you do to me. Just please stop [harassing me about the alleged cheating]." But M.W. also testified that when appellant proceeded to have sex with her on the bed on Sunday, she told him to stop because she was in too much pain. A reasonable jury could find that in the context M.W. described — a resumption of appellant's angry accusations — appellant caused M.W. to submit to sex on that occasion by placing M.W. in reasonable fear that she would be subjected to bodily injury if she tried to resist physically.

Citing *Elonis v. United States*, 135 S. Ct. 2001 (2015), and this court's opinion in *Carrell v. United States*, 165 A.3d 314 (2017) (en banc), appellant argues, for the first time on appeal, that the trial court erred by failing to instruct the jury that to find that appellant caused M.W. to engage in sex by threatening her, the jury had to find "that something [appellant] said was (1) intended as a threat and (2) reasonably perceived as a threat." This argument is unavailing. We see no possibility that the jury convicted appellant of first-degree sexual abuse on the theory that the words appellant uttered just before M.W. submitted to sex on the bed on January 15 constituted a threat.[5] M.W. testified that appellant's words were "Bitch, I might as well. Everybody else is getting it. No telling when I'll get some more." The prosecutor did not argue that this statement or any other statement by appellant was the vehicle by which appellant overcame M.W.'s will in causing her to have sex. It certainly is not plain that *Elonis* or *Carrell* applies in the context presented here, i.e., appellant's placing M.W. in fear by his conduct; but even if we assume the instructional error appellant posits, the error was harmless (under any standard of review).

---

[5] We acknowledge, however, that the Certification of Sex Offender and Notice Order in the record states that appellant was found guilty of "First Degree Sex Abuse (Threatening)[,]" but the jury verdict form shows that the jury found appellant guilty of "FIRST DEGREE SEXUAL ABUSE (Bedroom Jan. 15, 2017)[.]"

**V.**

"The Double Jeopardy Clause compels merger of duplicative convictions for the same offense, so as to leave only a single sentence for that offense." *Nero*, 73 A.3d at 159 (internal quotation marks omitted). "Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.* (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)) (internal quotation marks and brackets omitted). In applying the *Blockburger* test, we focus on the statutory elements of each offense, not on the particular "proof offered to establish the crimes." *Iannelli v. United States*, 420 U.S. 770, 785 n.17 (1975).

Appellant's contention is that his armed kidnapping and ADW convictions merge. We disagree. As already discussed, a conviction of armed kidnapping requires proof that the defendant "while armed, intentionally seized, confined, or carried [the victim] away," and "held or detained [the victim] against her will." *Kaliku*, 994 A.2d at 786-87. To prove that a defendant committed ADW, the government must prove "the three elements of simple assault, plus the use of a

dangerous weapon." *Vines v. United States*, 70 A.3d 1170, 1180 (D.C. 2013), as *amended*, No. 11-CF-843, 2013 D.C. App. LEXIS 616, at *25 (D.C. Sept. 19, 2013). To sustain a conviction for simple assault, "the government must establish: (1) an act on the part of the defendant; (2) the apparent present ability to injure the victim at the time the act is committed; and (3) the intent to perform the act which constitutes the assault at the time the defendant commits the act." *Id.* at 1179. In short, armed kidnapping requires "proof of asportation or confinement," while ADW requires proof of "some form of assault." *Whitaker v. United States*, 616 A.2d 843, 856 (D.C. 1992). Because each "requires proof of a fact which the other does not[,]" *Nero*, 73 A.3d at 159 (internal quotation marks omitted), they do not merge.

Appellant, asserting that "[t]o the extent there was a kidnapping[,]" "it was purely incidental to the assault[,]" relies on *Nelson v. United States*, 601 A.2d 582 (D.C. 1991). In *Nelson*, a division of this court, citing *Robinson v. United States*, 388 A.2d 1210 (D.C. 1978), stated that "[w]hen a kidnapping charge is joined with other charges, the key inquiry is whether the seizure or asportation of the victim was merely incidental to another crime, and thus an integral part of it, or whether the confinement and restraint were significant enough in themselves to warrant an independent prosecution for kidnapping." *Nelson*, 601 A.2d at 598. Appellant's

reliance on *Nelson* and *Robinson* is misplaced, because in this court's *en banc* decision in *Byrd v. United States*, 598 A.2d 386 (D.C. 1991), we overruled *Robinson* and held that the merger analysis should be governed by the *Blockburger* "elements test[.]" *Richardson*, 116 A.3d at 439-40.

Moreover, even if the factors the *Nelson* division found relevant are considered, they do not help appellant's cause. *Nelson* reasoned that "whether the confinement and restraint were significant enough in themselves to warrant an independent prosecution for kidnapping" "may depend on whether the kidnapping substantially increased the risk of harm to the victim beyond that inherent in the underlying crime" or "lessen[ed] the likelihood of [the perpetrator's] capture" by enabling him to act out of the sight of potential witnesses. 601 A.2d at 598. M.W.'s confinement in the cramped space of the storage unit meant that "there was really no room [for her] to fight back." In addition, after the beating, M.W. had to forgo medical attention, even though she knew she needed it, because she could not get out of the storage unit. Thus, M.W.'s confinement increased her risk of harm. Thus, the *Nelson* test would, like the *Blockburger* test, dictate that appellant's kidnapping and ADW convictions do not merge.

## VI.

The trial court sentenced appellant to consecutive sentences of 12.5 years of imprisonment for armed kidnapping and 250 months for first-degree sexual abuse, for a total of over 33 years' imprisonment. Appellant contends that these sentences violate the Eighth Amendment prohibition against cruel and unusual punishments. We cannot agree.

"[T]he Eighth Amendment's ban on cruel and unusual punishments prohibits sentences that are disproportionate to the crime committed[.]" *Ewing v. California*, 538 U.S. 11, 22 (2003) (internal quotation marks and ellipsis omitted). The Eighth Amendment "prohibits imposition of a sentence that is grossly disproportionate to the severity of the crime." *Id.* at 21 (internal quotation marks omitted); *see also Cook*, 932 A.2d at 508 (recognizing that "the standard for claims of disproportionate sentences has been narrowed and, at a minimum, now appears to require a showing that a sentence is 'grossly disproportionate' to the crime").

Here, in imposing the sentences, the trial court noted "the significance of the injuries M.W. suffered" and cited the testimony of the police officer who

interacted with M.W. at the 5D police station, who "said she had never seen anything so bad in her life." The court also took into account appellant's history of violent behavior (including his history of beating up multiple women with bats), which spanned years over most of appellant's adult life and included his mother and father as victims. The court observed that appellant appeared "to have no ability to control [him]self" and cited a need not to "expose the community to the risk of harm [appellant had] placed on other people" connected to him.

Further, "courts should be reluctant to review legislatively mandated terms of imprisonment, and . . . successful challenges to the proportionality of particular sentences should be exceedingly rare." *Ewing*, 538 U.S. at 22 (internal quotation marks omitted). Appellant's sentences for armed kidnapping and first-degree sexual abuse fall well below the applicable statutory maximums. Under D.C. Code § 22-4502(a)(2) (2017), appellant could have been sentenced to up to 30 years' imprisonment for armed kidnapping. Under D.C. Code § 22-3002(b), he could have been sentenced to up to 30 years' imprisonment for first-degree sexual abuse. His 12.5-year sentence for armed kidnapping and his 20 years and 10 months sentence of first-degree sexual abuse, pale in comparison to those legislatively mandated maximums. For that reason and all the foregoing reasons, we reject appellant's claim that his sentences were unconstitutional.

## VII.

For the foregoing reasons, the judgment of conviction is

*Affirmed.*